In the Matter of LEFRAK FOREST HILLS CORP. et al., Petitioners, v. THOMAS F. GALVIN et al., Constituting the Board of Standards and Appeals of the City of New York, et al., Respondents, and FREDERIC S. BAUM et al., Intervenors-Respondents.

In the Matter of FRANKLIN NATIONAL BANK, Petitioner, v. THOMAS F. GALVIN et al., Constituting the Board of Standards and Appeals of the City of New York, Respondents, and FREDERIC S. BAUM et al., Intervenors-Respondents.

Second Department, December 26, 1972.

*Stroock & Stroock & Lavan (Charles G. Moerdler, Nathan Z. Dershowitz, Robert P. Stein, Richard S. Lane* and *Stephen Hochberg* of counsel), for Lefrak Forest Hills Corp. and another, petitioners.

*Murray Rudman* for Franklin National Bank, petitioner.

*Norman Redlich, Corporation Counsel (Jesse J. Fine* of counsel), for respondents.

*Corner, Finn, Cuomo & Charles* and *Gering, Gross & Gross (Mario Matthew Cuomo* of counsel), for intervenors-respondents.

HOPKINS, Acting P. J.  The question before us is whether the Board of Standards and Appeals of the City of New York improperly denied the applications of petitioners Lefrak Forest Hills Corp. and Lefrak Kew Gardens Corp. (hereinafter called Lefrak) for a further extension of permits first issued in 1963 and successively extended until December 15, 1971 to build an apartment house project on property located in the Kew Gardens-Forest Hills area in Queens County.  We hold that the applications were improperly denied, that the board's determination

should be annulled and that Lefrak's applications should be granted. [1]

The simplicity of the question cannot veil the complexity of the facts revealed by the history of the project. The ultimate legal issue, however, in our view, is whether the reciprocal actions of the board in granting the past extensions and of Lefrak and the predecessor owners of the property in making improvements to the property and incurring obligations in reliance on the permits have given rise to the vesting of rights and equitable considerations which now cannot be abrogated.

In 1961 the Long Island Railroad owned the property, a part of its right of way. In March of that year the railroad agreed to sell it to Adson Industries, Inc. for the construction of apartment houses over the right of way. As a part of the sale, a perpetual easement over the property for railroad purposes was reserved to the railroad. That is to say, the buildings were to be constructed over the railroad right of way. Effective December 15, 1961 a new zoning resolution was enacted by the City of New York in 1960. The present controversy arises from the terms of that resolution.

The new zoning resolution prevented the erection of high rise apartment developments in the Forest Hills-Kew Gardens area. It permitted apartment houses, but at a density and scale lower than that contemplated by Adson. The new resolution, moreover, authorized the issuance of building permits for construction allowed under the old law (1960 Zoning Resolution, § 11–321); by amendment in 1963 the Board of Standards and Appeals was empowered to extend such permits for a major development for a period of two years (1960 Zoning Resolution, § 11–322). Adson applied in 1961 for permits for the construction of two apartment buildings conforming to the old law and, in the summer of 1963, final permits for that construction were issued. In the meantime Adson had assigned its rights under the contract of sale with the railroad to two wholly owned subsidiaries, Park Lane Plaza North, Inc. and Park Lane Plaza South, Inc.

The issuance of the building permits produced litigation. Certain of the intervenors in these proceedings appealed to the board and, in November, 1963, the board determined that the

---

1. Two proceedings were argued before us and are here considered: (1) by Franklin National Bank to annul the determination denying an extension of building permits; and (2) by Lefrak Forest Hills Corp. and Lefrak Kew Gardens Corp. for the same relief. Each proceeding presents similar facts and issues.

permits were proper.[2] That determination was contested by proceedings under article 78 of the CPLR which were dismissed (*Matter of Brunschwig* v. *Foley*, 24 A D 2d 555, mot. for lv. to app. den. 16 N Y 2d 487; *Matter of Fleming* v. *Foley*, 43 Misc 2d 280).

At the time of the expiration date of the permits — December 15, 1963 — work had commenced on the project but of course had not been completed. In March, 1964 the board granted an extension of the permits for two years, finding that the project was a " major development " and that substantial construction of the foundations of at least one of the buildings had occurred. That determination was again attacked by certain of the intervenors in these proceedings and again the attack failed (*Matter of Brunschwig* v. *Foley*, 25 A D 2d 495; *Matter of O'Brien* v. *Foley*, 25 A D 2d 496).

In 1964 the 1960 Zoning Resolution was amended by the addition of a provision authorizing the board in appropriate cases to grant extensions of time, " each limited to one term not to exceed one year, " for the completion of any building for which substantial construction of foundations had been completed at the time of the expiration of the preceding extension (1960 Zoning Resolution, § 11–324).[3] Taking advantage of those pro-

---

2. The contract of sale with the railroad was itself unsuccessfully challenged in court (*Brunschwig* v. *Long Is. R. R. Co.*, 41 Misc 2d 24).

3. The amendment reads as follows:

"11–324 Further extensions

"For minor or major developments for which extensions of time have been authorized in accordance with the provisions of Section 11–322 (Extension of period to complete construction) or Section 11–323 (Extension for development subject to delay), but which have not been completed within the term of the extension, the Board, upon application filed before the expiration date of the term of the preceding extension, may in appropriate cases grant additional extensions of time, each limited to one term not to exceed one year:

" (a) For the completion of any *building* for which the Board finds that, on or before the date of expiration of the term of the preceding extension, substantial construction of foundations has been completed, or

" (b) For the completion of any *building* for which an extension of time was authorized under the provisions of Section 11–323, but for which substantial construction of foundations has not been completed within the term of the preceding extension, provided that the Board finds that:

" (1) the criteria under which the preceding extension was permissible would excuse applicant's failure to complete such amount of construction, or

" (2) applicant was prevented from completing such amount of construction by other hardship or inequity beyond his control, not including real estate market conditions or difficulties in obtaining the necessary financing.

"For any such *building* which is not completed and for which such application for an additional extension of time is not filed before the expiration date of the term of the preceding extension, or is denied, the building permit shall lapse on such expiration date or on the date of such denial.

visions, Adson applied in December, 1965 for a further extension of the permits; in March, 1966 the board granted an extension for one year — the subject of yet another contest which came to naught (*Matter of Brunschwig* [*Foley*] [Sup. Ct., Queens County], N. Y. L. J., June 26, 1967, p. 18, col. 8; *Matter of O'Brien* [*Foley*] [Sup. Ct., Queens County], N. Y. L. J., June 26, 1967, p. 18, col. 8).

Again, in 1966 Adson applied for another extension until December, 1967, which was granted; and, again, the action of the board was sustained after challenge by proceedings under article 78 of the CPLR (*Matter of Brunschwig* [*Glass*]; *Matter of Fleming* [*Glass*] [Sup. Ct., Queens County], N. Y. L. J., Feb. 4, 1969, p. 22, col. 3). In 1967, however, there was a change in the ownership of the property. Adson defaulted on an $800,000 mortgage held by the Franklin National Bank and the latter purchased the property at a foreclosure sale.

Franklin then applied in 1967 for a further extension; that was granted by the board and the determination upheld by the courts (*Brunschwig* v. *Glass*; *Matter of Fleming* [*Glass*] [Sup. Ct., Queens County], N. Y. L. J., March 3, 1970, p. 18, col. 1). In 1968 still another extension was granted by the board; proceedings brought to annul that action were discontinued by stipulation. In 1969 Franklin obtained an extension for another year; proceedings to review the boards' determination were dismissed and affirmed by this court (*Matter of O'Brien* v. *Glass*, 40 A D 2d 1015, decided herewith).[4]

In 1970 Franklin sought a further extension until December 15, 1971. It informed the board that every effort would be made to secure a builder to complete the construction in 1971. The

"For other construction for which an extension of time has been authorized in accordance with the provisions of Section 11–322 (Extension of period to complete construction), but which has not been completed within the term of the extension, the Board, upon application filed no later than 30 days after the expiration date of the term of the preceding extension or 30 days after the effective date of this amendment (June 11, 1964), whichever is the later date, may in appropriate cases grant only one additional extension of time limited to a term not to exceed one year, for completion of any such construction, for which the Board finds that, at the time the application is filed, a substantial portion of such construction has been completed and substantial expenditures in connection with such construction have been made.

"For any such other construction which is not completed and for which such application for an additional extension of time is not filed within such 30 day period after the expiration date of the term of the preceding extension or 30 days after the effective date of this amendment (June 11, 1964) whichever is the later date, or is denied, the building permit shall lapse."

4. The question presented by that proceeding was simply the power of the board to grant more than one extension of a permit.

board granted the extension and proceedings to annul that extension are pending in the Supreme Court, Queens County. Franklin then contracted to sell the property to Lefrak in April, 1971.[5] Between contract and closing on November 30, 1971 Lefrak entered into possession and worked on site preparation. It also changed the original building plans to provide for two 20-story towers; and the building permits were accordingly amended by the Queens Borough Superintendent in August, 1971.

On December 10, 1971 Lefrak applied for an additional one-year extension of the permits. At the hearings before the board Lefrak showed that as of December 15, 1971 about 844 cubic yards of concrete had been installed for foundations and walls, over $600,000 had been incurred for construction expense, over $450,000 in other costs, and over $5,800,000 had been obligated under contracts for the construction. In addition, Lefrak submitted proof that after December 15, 1971 it had installed about 1,629 cubic yards more concrete (a total of about 2,475 cubic yards) and over $400,000 more had been incurred for construction costs (a total of about $1,450,000).

The board denied Lefrak's application. It found that (1) Lefrak did not have a possessory interest in the property as of June 15, 1963 or during prior extensions of the permits; (2) Lefrak had not established substantial construction of the foundations prior to December 15, 1971; and (3) this was not an appropriate case for its exercise of discretion. It is of this denial that Lefrak seeks review in its instant proceeding, opposed by the board and the intervenors.

We put aside quickly the board's finding that Lefrak lacks a possessory interest. The board makes no genuine attempt to defend its position on that issue on this appeal. Nothing in the 1960 Zoning Resolution requires a possessory interest as of December 15, 1963 or as of June 15, 1963 (see 1960 Zoning Resolution, §§ 11–322, 11–323, 11–324); nor does it prohibit the transfer of building permits or of the property — a provision which might well be unconstitutional (cf. *Matter of Weinrib* v. *Weisler*, 33 A D 2d 923, affd. 27 N Y 2d 592). Hence, the board's refusal to grant a further extension must be justified by the second and third grounds upon which it relied.

The board's refusal cannot be scanned without regard to the history of its prior actions. That history is epitomized by a series of applications for extensions to build — seven in all — in which the owner implored the board to grant more time to

---

5. Franklin received $200,000 for the property — $10,000 in cash, and $190,000 by a purchase-money mortgage.

complete the project, the last four of which (since 1967) having been made by a bank which was seeking a builder with the means and ability to undertake a construction of considerable magnitude. When at last the bank succeeded in finding the builder willing to proceed, the board in effect reversed its prior rulings, all of which to date had been sustained by the courts, and determined that the development was not appropriate and that work on the foundations had not been substantially completed. It is, we think, too late in the chronicle of these proceedings for the board to adopt that conclusion, contrary to all that it decided before.

It is not necessary to invoke the doctrine of *res judicata* against the board, though the considerations of public policy that buttress the doctrine have relevance here. There are different parties in these proceedings from those which brought the earlier proceedings to review under article 78 of the CPLR and, technically, they are not bound by the judgments reached (cf. *Matter of Sullivan,* 289 N. Y. 323; *Robin-Gay Apts.* v. *Berman,* 26 A D 2d 537; but, see *Matter of Evans* v. *Monaghan,* 306 N. Y. 312, 323–324). Nevertheless, the board's construction of the zoning resolution under which it acted and of the circumstances shown in the prior proceedings cannot be arbitrarily jettisoned. The board's determinations in these aspects were reasonable — as the court's judgments concluded — and a regard for the criteria of principled decisions is as applicable to administrative agencies as to courts themselves (cf. *Matter of Demisay, Inc.* v. *Petito,* 33 A D 2d 910; *Matter of Holmes & Murphy* v. *Bush,* 6 A D 2d 200; *Matter of Grand Chapter of Phi Sigma Kappa* v. *Grosberg,* 30 A D 2d 887). '' The risk of imposition of some measure of legal consistency by the court upon administrative agencies is part of the tariff that must be paid for whatever advantage can be claimed for review by a law court of the work of an administrator '' (*Matter of Dresher [Lubin],* 286 App. Div. 591, 594). Capricious action in a legal sense is established when an administrative agency on identical facts decides differently (*Matter of Fitzgerald* v. *State Div. of Dept. of Public Serv. of State of N. Y.,* 262 App. Div. 393, 397).

Whether the decision of an administrative board is arbitrary in a given case cannot be resolved by the single standard that we ascertain if it falls within the board's discretion under provisions of law. In this case the exercise of discretion by the board in denying the extension cannot be disassociated from its exercise of discretion in granting past extensions. If we were to look only at the board's action before us, we would blind our

eyes to the equities and rights upon which Lefrak and Franklin might justifiably depend in dealing with the property. That does. not mean that the board could not take into account the long delay in completing the construction reflected by the seven previous applications for extensions[6]; but equally it means that the board could not ignore its own determinations to condone the delay and its own findings of substantial construction and appropriateness of the property for the relief granted.

Here the exercise of discretion in refusing another extension is particularly beyond justification in the face of the large expenditures and the contracting of liabilities by Lefrak, on the strength of the extensions, after it had purchased the property. A vested right to finish a nonconforming building matures when substantial work is performed and obligations are assumed in reliance on a permit legally issued (*People ex rel. Ortenberg* v. *Bales,* 224 App. Div. 87, affd. 250 N. Y. 598; *Matter of Jayne Estates* v. *Raynor,* 22 N Y 2d 417, 422–423; *Matter of Glenel Realty Corp.* v. *Worthington,* 4 A D 2d 702; *Collins* v. *Magony,* 31 A D 2d 597). We see nothing in the record that indicates that Lefrak was not behaving in good faith in proceeding as it did under the permits. Indeed, the city authorities gave tacit approval to Lefrak's performance by issuing in August, 1971 amended permits authorizing construction under the plans submitted by Lefrak.

It could hardly be expected either by the board or Lefrak that construction of the project of the size contemplated could be accomplished within the year of the last extension. Once the board had embarked on its decision to approve extensions of the right to continue the project, implicitly it accepted the high probability that the project would require further time for final completion. There is no fixed formula which measures the content of all the circumstances whereby a party is said to possess '' a vested right ''; it is a term, rather, which sums up a judicial determination that the facts of the case render it inequitable that the State impede the individual from taking certain action (cf. *Matter of Humble Oil & Refining Co.* v. *Worthington,* 49 Misc 2d 432). In our view, Lefrak acquired a vested right to proceed under its permits in the light of the combined force of the prior determinations of the board, upheld by the courts, the expenditures made in reliance on the permits prior to the time Lefrak purchased the property, and the expenditures and the

---

6. The continuing litigation with which the permits and their extensions were burdened might well have been a cause for the delay; we are not able to calculate the extent by which it increased the delay on this record.

assumption of contractual liabilities made by Lefrak in reliance on the permits subsequent to its purchase of the property.

Accordingly, the determination of the board should be annulled, on the law, without costs, and the board directed to issue an extension of the permits for one year beginning from the date of the order entered hereon.[7]

MUNDER, J. (dissenting). I dissent and vote to confirm the determination of the board and dismiss the petitions.

In my opinion, there is substantial evidence in the record to support the findings of the respondent Board of Standards and Appeals that (1) petitioners Lefrak failed to satisfy the statutory requirement of completion of substantial construction of foundations prior to December 15, 1971, the expiration date of the preceding permit extension; and (2) this is not an " appropriate " case for the granting of a further extension. Although these findings are sufficient, in and of themselves, to support the denial, I agree with the majority that a third finding, Lefrak's lack of a possessory interest in the property in 1963, is not a proper ground for the denial of a further extension.

As respects Lefrak's argument that the seven previous permit extensions herein granted to its predecessors in interest operate as *res judicata* or an estoppel, I note first that we are *not* dealing with a builder who, relying on a valid permit, has proceeded with construction *prior* to a zoning change to a point where he has acquired a vested right to continue and complete the structure (see, e.g., *Matter of Glenel Realty Corp.* v. *Worthington,* 4 A D 2d 702). Rather, we have here a grace period provision which offered landowners the opportunity to secure building permits and begin construction on nonconforming buildings *after* the effective date of the new zoning ordinance (Dec. 15, 1961) (1960 Zoning Resolution, § 11–321). In the event construction was begun but not completed by December 15, 1963, a two-year extension of the building permit could be secured pursuant to section 11–322, provided substantial construction of foundations had been completed prior to December 15, 1963. Section 11–324, enacted in 1964, authorized additional one-year extensions of building permits, " in appropriate cases ", if, as stated in subdivision (a), " on or before the date of the expiration of the

---

7. As the last extension expired on December 15, 1971, and this appeal has just reached us, it obviously would benefit Lefrak nothing to direct the issuance of a permit for one year from that expiration date; we have determined that we may in the exercise of our power grant an extension for one year from the date of our order (CPLR 7806, 5522).

term of the preceding extension, substantial construction of foundations has been completed ". (Sections 11–323 and 11–324 [subd. (b)] deal with extensions where less than substantial construction of foundations has been completed.)

The original plans and permit applications were filed in April, 1961 by Adson Industries, Inc., then a contract vendee. Permits upon amended plans complying with the pre-1961 zoning law were finally issued in or about August, 1963 and construction was commenced. Thereafter, Adson secured three successive extensions of its building permits pursuant to sections 11–322 and 11–324 (subd. [a]). In 1965, Adson, or more properly two wholly owned subsidiaries to whom the property had been transferred, defaulted on a mortgage held by the Franklin National Bank; and the latter took title upon a sale following a judgment of foreclosure which was entered in 1966. Franklin then secured four additional extensions of the permits pursuant to subdivision (a) of section 11–324, the last one expiring on December 15, 1971. In April, 1971 Franklin entered into a contract of sale with Lefrak, which then amended the building plans and did some preliminary site preparation work. After title closed in November, 1971, Lefrak began actual construction work on the foundations. On December 10, 1971, five days before the expiration of the existing permit extensions, Lefrak filed applications for an additional one-year extension. This time, however, the extensions were denied.

Preliminarily, I note that the failure to get beyond even the foundation stage of construction in nine years seems to have been due in great part to the very nature of the project, i.e., the construction of two high-rise, middle-income apartment buildings over the tracks of the Long Island Railroad. The necessity of working in the track bed without disruption of the railroad's train schedule presented almost insurmountable problems from the start. After Adson and/or its subsidiaries went bankrupt, it took Franklin National Bank more than four years to find another builder willing to undertake the project and, even then, construction was commenced only after the building plans were modified to eliminate most of the track bed work.

The seven prior extensions herein were granted after rather *pro forma* hearings. Most were upheld in the courts as against only technical challenges by intervening adjacent homeowners. Indeed, compliance with the statutory criterion of " appropriateness " seems never to have been controverted in the past and compliance with the substantial construction requirement only once. Upon the instant hearings, attended by numerous

public officials, representatives of local civic associations, home-owners and tenants, these issues were vigorously contested.[1]

Nevertheless, whether or not the board was correct in granting the prior extensions is not the issue here. Nor may those prior determinations raise the bar of *res judicata,* for, among other reasons, the statute (§ 11–324) clearly contemplates that the annual extension applications will each be determined upon evidence of construction completed during the year immediately preceding. Still, the question remains whether the prior extensions, granted upon similar or even less proof of statutory compliance, render the instant denial arbitrary or capricious. I think not.

It is now more than 10 years since the effective date of the new zoning ordinance and, significantly, the last extension herein was secured by the Franklin National Bank on the representation that it would find a builder and *complete* the buildings within 1971, even if it meant taking a substantial loss. Indeed, Franklin even proffered a letter of intent from a builder other than Lefrak. After so much delay, the board had a right to expect that it would be presented with at least a partially completed building if and when a further extension were requested. Yet, all it found upon Lefrak's applications was that construction of the foundations had been started (Lefrak claimed 13% of the foundations had been completed while the intervenors contended only 4% had been completed).[2] Furthermore, Lefrak had modified the building plans and allegedly virtually abandoned whatever construction or site preparation work had been done in the past. While the change in plans was technically permissible so long as the new plans did not increase noncon-formity with the new zoning law, Lefrak did not have a *permanent* license to construct a nonconforming building and the board had a right to consider this as a significant change in circumstances since its prior determination.

---

1. Indeed, the board's returns on the seven prior extensions, filed in the Supreme Court, Queens County, comprise a grand total of only 592 pages, with the longest return only 147 pages. The instant record totals 2,144 pages.

2. The proof submitted on the issue of substantial construction was highly conflicting. Lefrak claimed it had poured 863 cubic yards of concrete as of December 15, 1971. However, its concrete delivery tickets showed only about 300 yards poured as of that date. Lefrak also claimed it had paid or incurred $600,000 in construction and related expenses prior to December 15, 1971 and had additional contractual commitments in the millions. The intervenors not only cast doubt upon the legitimacy of many of these alleged expenditures but contended that many would not have to be honored at all if the permit extension were denied.

In addition, there was raised at this hearing, for the first time, a real question as to whether this was an appropriate case for a further extension. Lefrak does not accept the board's "definition" of the appropriateness criterion and argues that it improperly treated the applications as one for a variance. However, I believe the statutory language to be sufficiently specific (*Chiropractic Assn. of N. Y.* v. *Hilleboe,* 12 N Y 2d 109, 120; *Matter of City of Utica* v. *Water Pollution Control Bd.,* 5 N Y 2d 164, 169–170) and to denote something other than mere proof of completion of substantial construction of foundations or physical evidence of a commitment to build, which is really the same thing. In other words, even if the substantial construction requirement is met, the board still retains a measure of discretion in determining whether the case is an appropriate one for a further extension. Without attempting to limit the bounds of that discretion, I believe that the question of whether the proposed development is still in the public interest must come into play at this point and that the new evidence presented thereon was almost unanimously against this development and virtually uncontradicted.

Thus, for example, it was shown that the proposed 20-story twin towers will not only be grossly disproportionate to the immediate area, which consists solely of private homes and four- to six-story apartment buildings, but that the market for such conventionally financed "middle-income" housing is already glutted and schools and public transportation overcrowded. In addition, the only access to the proposed Lefrak towers is from Union Turnpike. A half-block away, traffic in and from the Interboro Parkway and Queens Boulevard converges and conditions are such that parking is not even permitted in this section of the Turnpike during daylight hours. Furthermore, the Turnpike is divided into one-way segments at this point, the divider being the depressed Interboro Parkway. Although Lefrak plans a substantial setback and turnaround driveway for each building, cars proceeding west on the Turnpike would have a difficult time getting to the building abutting the eastbound lanes, and vice versa. Finally, there was also testimony that one moving van or one fire engine could effectively block the Turnpike to all traffic; that the parking problem is already so bad that Forest Hills Gardens, which abuts this development to the northwest, has had to institute a tow-away program to remove parked cars from its private streets; and that the sidewalks are so narrow near one of the

proposed Lefrak buildings that the city had to install metal barricades to protect pedestrians from automobiles.

In short, under all the circumstances here presented, I find that the board was not bound by the prior extensions granted Lefrak's predecessors in interest and that the instant denial of a further extension of the building permits should be upheld as based upon substantial evidence in the record.

GULOTTA and BENJAMIN, JJ., concur with HOPKINS, Acting P. J.; MUNDER, J., dissents and votes to confirm the determination and dismiss the petitions, with an opinion, in which MARTUSCELLO, J., concurs.

Determination annulled, on the law, without costs, and Board of Standards and Appeals directed to issue an extension of the permits for one year beginning from the date of the order entered hereon.