**DELTA AIR LINES, INC., Allegheny Airlines, Inc., National Airlines, Inc., Piedmont Aviation, Inc., Braniff Airways, Inc., North Central Airlines, Inc., Southern Airways, Inc., Eastern Air Lines, Inc., Northwest Airlines, Inc., Trans World Airlines, Inc., Ozark Air Lines, Inc., American Airlines, Inc., Pan American World Airways, Inc., and United Air Lines, Inc., Plaintiffs-Appellees-Cross-Appellants,**

v.

**Werner H. KRAMARSKY, Individually and in his capacity as Commissioner of the New York State Division of Human Rights; Ann Thacher Anderson, Individually and in her capacity as General Counsel of the New York State Division of Human Rights; The New York State Division of Human Rights, an agency of the Executive Department of the State of New York; Arthur Cooperman, Individually and in his capacity as Chairman of the New York State Workmen's Compensation Board; and the New York State Workmen's Compensation Board, Defendants-Appellants-Cross-Appellees.**

**Nos. 18, 57, Dockets 80–7179, 80–7225.**

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1980.

Decided May 11, 1981.

J. Stanley Hawkins, Atlanta, Ga. (Dean Booth, Keith M. Wiener, Seward & Kissell, Atlanta, Ga., on the brief), for plaintiffs-appellees-cross-appellants Delta Air Lines, Inc., et al.

Ann Thacher Anderson, Gen. Counsel, State Div. of Human Rights, New York City, for defendants-appellants Werner H. Kramarsky et al.

Myrna M. Martinez, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N. Y., Shirley Adelson Siegel, Sol. Gen., Peter Bienstock, Asst. Atty. Gen., Daniel Berger, Deputy Asst. Atty. Gen., New York City, on the brief), for defendants-cross-appellees Arthur Cooperman et al.

Carol Moschandreas, Washington, D. C. (Leroy D. Clark, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Lutz Alexander Prager, Washington, D. C., on the brief), for Equal Employment Opportunity Commission as amicus curiae.

Before MOORE and KEARSE, Circuit Judges, and TENNEY, District Judge.*

KEARSE, Circuit Judge:

Defendants New York State Division of Human Rights, Werner Kramarsky, its Commissioner, and Ann Thacher Anderson, its General Counsel (collectively the "Commissioner"), appeal from so much of a judgment of the United States District Court for the Southern District of New York, Morris E. Lasker, *Judge*, 485 F.Supp. 300 (S.D.N.Y.1980), as enjoined them from requiring plaintiffs to alter their employee benefit plans to conform with New York's Human Rights Law, N.Y. Exec. Law § 296 (McKinney 1972 & Supp. 1980–1981) ("HRL"). Plaintiffs Delta Air Lines, Inc., *et al.* (the "airlines"), cross-appeal from so much of the judgment as dismissed their complaint seeking a similar injunction against enforcement by the New York

---

* Honorable Charles H. Tenney, Senior Judge of the United States District Court for the South-ern District of New York, sitting by designation.

State Workmen's Compensation Board and its Chairman, Arthur Cooperman (collectively the "Board"), of New York's Disability Benefits Law, N.Y. Work. Comp. Law § 205(3) (McKinney Supp. 1980–81) ("DBL"). For the reasons below we reverse the ruling as to the HRL, and vacate the ruling as to the DBL and remand for further proceedings.

## I. BACKGROUND

Section 296 of the HRL requires that employee benefit plans provide coverage for disability due to pregnancy on the same basis on which other disabling conditions are covered.[1] Section 205(3) of the DBL requires employers to provide at least eight weeks of coverage for pregnancy-related disability.[2] The plaintiff airlines maintain various employee benefits plans, including sickness and accident disability plans, sick leave plans, and medical benefit plans, through which payments are made to their employees who suffer nonoccupational illnesses or injuries covered by the plans. During the periods relevant herein their plans did not provide complete coverage for disabilities or costs associated with pregnancies. Plaintiffs brought the present action seeking declaratory and injunctive relief against enforcement of the HRL and the DBL on the grounds that each is preempted by any of three federal statutes: (1) the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1381 (1976 & Supp. II 1977) ("ERISA"); (2) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1976) ("Title VII"); or (3) the Railway Labor Act, 45 U.S.C. §§ 151–188 (1976) ("RLA").[3]

### A. The Statutory Grid

#### 1. Federal and State laws relating to discrimination

Section 703(a)(1) of Title VII, enacted in 1964 as part of the Civil Rights Act, makes it unlawful for an employer to discriminate against an employee "because of . . . sex." 42 U.S.C. § 2000e–2(a)(1). As originally enacted, Title VII did not specify whether or not denial of employee benefits related to pregnancy was intended to constitute discrimination because of sex. In 1976, the Supreme Court held that an employer's exclusion of pregnancy-related benefits from coverage under disability benefit plans did not constitute discrimination "because of

---

1. The HRL provides in part as follows:
   1. It shall be an unlawful discriminatory practice:
      (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.
      (b) For an employment agency to discriminate against any individual because of age, race, creed, color, national origin, sex, or disability or marital status, in receiving, classifying, disposing or otherwise acting upon applications for its services or in referring an applicant or applicants to an employer or employers.
      (c) For a labor organization, because of the age, race, creed, color, national origin, sex, or disability or marital status of any individual, to exclude or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer.
   N.Y. Exec. Law § 296(1), as amended.

2. The DBL provides in part as follows:

No employee shall be entitled to benefits under this article:

   .    .    .    .    .

3. notwithstanding any other provision of law, for a period of disability in excess of eight weeks caused by or arising in connection with a pregnancy except for a period of disability occurring as a result of a complication of such pregnancy, and the liability of the employer or the chairman as provided in this article shall be the exclusive statutory remedy of an employee for disability caused by or arising in connection with a pregnancy. . . .

N.Y. Work. Comp. Law § 205(3).

3. This is one of three unconsolidated cases argued together on appeal. Also argued were *Burroughs Corporation v. Kramarsky*, 650 F.2d 1308 and *Metropolitan Life Insurance Company v. Kramarsky*, 650 F.2d 1309, decided today in separate opinions. The plaintiffs in *Burroughs* and *Metropolitan* contended only that their employee benefit plans were not subject to the HRL on grounds of ERISA preemption. No other federal law was invoked, and no other New York law was challenged.

... sex" within the meaning of § 703(a)(1). *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).[4]

Like Title VII, New York's HRL prohibits discrimination in employment "because of ... sex." Unlike the United States Supreme Court, however, the New York Court of Appeals interpreted this language in its own statute to require private employers maintaining disability benefits plans to provide benefits for pregnancy on the same basis as for other covered disabilities. *Brooklyn Union Gas Co. v. New York State Human Rights Appeal Board*, 41 N.Y.2d 84, 390 N.Y.S.2d 884, 359 N.E.2d 393 (1976).[5] Soon afterward, New York amended the DBL to require employers to provide coverage for at least eight weeks of pregnancy-related disability.[6]

As of April 29, 1979, Title VII was amended to provide that the term "because of sex" would include the meaning "because of or on the basis of pregnancy, childbirth, or related medical conditions." Pub.L. 95–555, 92 Stat. 2076 (1978). The amendment further provided that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work ...." 42 U.S.C. § 2000e(k) (Supp. II 1978). Thus, after April 29, 1979, the HRL was no longer broader than Title VII.

2. *Federal law relating to employee benefits plans*

In 1974, Congress enacted ERISA, a comprehensive federal statutory program designed to curb a variety of abuses associated with pension and other employee benefits plans, *see* 29 U.S.C. § 1001 (statement of congressional purpose). To protect the integrity of the federal regulatory scheme, ERISA § 514(a), 29 U.S.C. § 1144(a), provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in [ERISA § 4(a), 29 U.S.C. § 1003(a)] and not exempt under [ERISA § 4(b), 29 U.S.C. § 1003(b)]." [7] Section 4(a) of ERISA extends ERISA coverage to "any

---

4. Earlier, with respect to state-sponsored plans, the Supreme Court had held, in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), that the denial of benefits for pregnancy-related disability did not invidiously discriminate against women in violation of the Equal Protection Clause of the Fourteenth Amendment.

5. The Court of Appeals had earlier interpreted the HRL to require pregnancy coverage in disability plans maintained by public employers, who were not subject to provisions of the DBL that formerly excepted pregnancy from among the conditions required to be covered under New York's disability insurance laws. *See, e. g., Union Free School Dist. No. 6 v. New York State Human Rights Appeal Board*, 35 N.Y.2d 371, 362 N.Y.S.2d 139, 320 N.E.2d 859 (1974). *Brooklyn Union Gas Co.* resolved the apparent conflict between the HRL and the DBL, both of which applied to private employers.

6. The effect of the amendment was to transfer jurisdiction of claims concerning pregnancy benefits from the state's Human Rights Division to its Workmen's Compensation Board. Counsel for the Commissioner informed the district court that the Board requires employers to treat pregnancy on a nondiscriminatory basis, so that employers who provide coverage beyond the DBL's eight week minimum for nonpregnancy-related disabilities must provide equal coverage for those that are pregnancy-related.

7. Section 514 provides in part:

(a) *Except as provided in subsection (b) of* this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [4(a)] of this title and not exempt under section [4(b)] of this title. This section shall take effect on January 1, 1975.

(b)(1) This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

(2)(A) Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

(B) Neither .an employee benefit plan described in section [4(a)] of this title, which is not exempt under section [4(b)] of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or invest-

employee benefit plan" maintained by an employer or union that affects interstate commerce. Section 4(b)(3) exempts from ERISA, *inter alia*, benefit plans "maintained solely for the purpose of complying with applicable ... disability insurance laws." [8]

### 3. *Federal law relating to employer-employee relations*

The RLA, enacted in 1926, regulates labor relations of interstate rail carriers, and is made applicable to air carriers by 45 U.S.C. § 181. The RLA is designed to promote the collective bargaining process, and generally permits the parties to collective bargaining to agree upon whatever terms are mutually satisfactory.

### B. *The Airlines' Contentions*

Plaintiffs contend that from December 20, 1976, when the HRL was first interpreted more broadly than Title VII, until April 29, 1979, when Title VII became as broad as the HRL, the HRL could not lawfully be applied to their employee benefit plans. Their principal contention is that because the HRL "relate[s] to" employee benefits plans within the meaning of ERISA § 514(a), that statute preempted the HRL during the above period, and thus relieved plaintiffs of any obligation to comply with it. In addition they argue that the RLA supersedes the HRL under general principles of federal labor law preemption, and that the inclusion of pregnancy benefits in

ment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

.　　.　　.　　.　　.

(4) Subsection (a) of this section shall not apply to any generally applicable criminal law of a State.

(c) For purposes of this section:

(1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

(2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

(d) Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law.

29 U.S.C. § 1144 (1976).

**8.** Sections 4(a) and (b) provide in pertinent part as follows:

(a) Except as provided in subsection (b) of this section ..., this subchapter shall apply to any employee benefit plan if it is established or maintained—

(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or

(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or

(3) by both.

(b) The provisions of this subchapter shall not apply to any employee benefit plan if—

(1) such plan is a governmental plan (as defined in section 1002(32) of this title);

(2) such plan is a church plan (as defined in section 1002(33) of this title) with respect to which no election has been made under section 410(d) of Title 26;

(3) such plan is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws;

(4) such plan is maintained outside of the United States primarily for the benefit of persons substantially all of whom are nonresident aliens; or

(5) such plan is an excess benefit plan (as defined in section 1002(36) of this title) and is unfunded.

29 U.S.C. § 1003(a), (b) (1976).

The term "employee benefit plan" is defined in ERISA to include an "employee welfare benefit plan." 29 U.S.C. § 1002(3). This latter term, in turn, means:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services,
. . . .

its disability plan pursuant to the HRL during that period would have constituted sex discrimination against male employees in violation of Title VII.[9]

Plaintiffs similarly contend that the DBL is preempted or superseded by ERISA, RLA and Title VII, but their challenge is not limited to the same period. Because the DBL imposes a specific minimum level of benefits for disability due to pregnancy (whereas the HRL requires only that pregnancy be treated the same as other disabilities), the DBL's command is not congruent with that of Title VII. Accordingly, plaintiffs argue that the DBL amendment was invalid from its effective date, August 3, 1977, to the present.

C. *The District Court's Decision*

The district court entered summary judgment in favor of plaintiffs on their claim that the HRL was preempted by ERISA, and enjoined enforcement of the HRL with respect to their employee benefit plans. In so ruling, the court relied on *Pervel Industries, Inc. v. Connecticut Comm'n on Human Rights & Opportunities*, 468 F.Supp. 490 (D.Conn.1978), *aff'd mem.*, 603 F.2d 214 (2d Cir. 1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980), in which this Court affirmed by summary order a ruling of then-District Judge Newman that ERISA § 514(a) preempted a Connecticut statute that is quite similar to the HRL. The court found it unnecessary to pass on the airlines' RLA and Title VII arguments concerning the HRL.

As to the DBL, the court rejected all of plaintiffs' arguments and granted the Board's motion to dismiss the complaint for failure to state a claim upon which relief could be granted. The court found that any provision of a benefit plan maintained in compliance with the DBL would be exempted from ERISA coverage by virtue of ERISA § 4(b)(3), 29 U.S.C. § 1003(b)(3), so that the preemption provisions of § 514(a) were inapplicable to the DBL. As to the RLA, the court held that the DBL regulat-

ed activity in which there was a "deeply rooted" local interest and therefore fell within an exception to the general rule that federal labor laws preempt state laws impinging on the collective bargaining process. Finally, relying on *General Electric Co. v. Gilbert, supra,* and *City of Los Angeles Department of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the court held that the DBL did not conflict with, and thus was not preempted by, federal antidiscrimination laws.

The Commissioner appeals from the district court's order invalidating the HRL; the airlines cross-appeal from the order upholding the DBL.

## II. ENFORCEABILITY OF THE HRL

We consider first plaintiffs' claims that federal law forbade enforcement of the HRL. For the reasons below, we conclude that the HRL was not preempted by ERISA, or Title VII, or the RLA.

A. *HRL and ERISA*

We turn first to the question of the validity of the HRL under § 514(a) of ERISA. Although at first glance our summary affirmance in the *Pervel* case, discussed above, would seem to require us to find the HRL invalid, equally summary action from another quarter compels a different result.

■ After the decision below was rendered, the United States Supreme Court dismissed, for want of a substantial federal question, appeals from decisions of two state courts, each holding that ERISA § 514(a) does not preempt state laws similar to the HRL. *Minnesota Mining & Manufacturing Co. v. Minnesota,* 444 U.S. 1041, 100 S.Ct. 725, 62 L.Ed.2d 726 (1980), *dismissing appeal from* 289 N.W.2d 396 (Minn. 1979) (hereinafter *"Minnesota"*); *Mountain States Telephone & Telegraph Co. v. Commissioner of Labor & Industry,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980), *dismissing appeal from* 608 P.2d 1047 (Mont.1979) (hereinafter *"Mountain*

---

9. Once the 1978 amendments to Title VII became effective on April 29, 1979, plaintiffs modified their disability benefits plans to com-

ply with Title VII as amended, and they apparently do not question the validity of the HRL after that date.

*States"*). The Commissioner here contends that *Minnesota* and *Mountain States* require us to hold that ERISA does not preempt the HRL, despite our contrary holding, relied on below, with respect to a comparable Connecticut statute in *Pervel, supra*. We agree.

■ It is well-established that Supreme Court summary affirmances and dismissals for want of a substantial federal question are judgments on the merits that bind lower courts with respect to the "precise issues presented [to the Supreme Court] and necessarily decided" by it in disposing of the appeal. *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (per curiam). *See also Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83, 99 S.Ct. 983, 989–90, 59 L.Ed.2d 230 (1979); *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 477–78 n.20, 99 S.Ct. 740, 749–50 n.20, 58 L.Ed.2d 740 (1979); *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). In attempting to apply the rule resulting from such a summary decision, however, lower courts must undertake a careful analysis of the precise "reach and content" of the Supreme Court's action. *Mandel v. Bradley, supra*, 432 U.S. at 176, 97 S.Ct. at 2240 (quoting *Hicks v. Miranda, supra*, 422 U.S. at 345 n.14, 95 S.Ct. at 2289 n.14). Such summary dispositions affirm only the judgment of the court below and do not necessarily adopt its reasoning. *Illinois State Board of Elections v. Socialist Workers Party, supra; Mandel v. Bradley, supra*. Thus,

a court seeking to apply such a precedent must carefully examine the appellant's jurisdictional statement in order to determine which questions the Supreme Court necessarily decided. *Washington v. Yakima Indian Nation, supra; Mandel v. Bradley, supra; Hicks v. Miranda, supra*. Applying this analysis to the dismissal in the *Minnesota* case, we conclude that it compels a holding that ERISA does not preempt the HRL.

In *Minnesota*, an employee who had been denied benefits for pregnancy-related disability sued her employer under a state law that explicitly required employers to treat pregnancy the same as other disabling conditions for purposes of disability benefits plans. The state court held that the employer's disability program violated state law, and further held that ERISA § 514(a) did not preempt the state statute. 289 N.W.2d 396.[10] In its jurisdictional statement on appeal to the Supreme Court, the employer framed the question presented as whether ERISA "preempts Minnesota's effort, by means of its fair employment practice statute, to dictate the contents of [the employer's] national employee benefit plan." The jurisdictional statement as a whole presented arguments, substantially similar to those presented by the plaintiffs here, to the effect that § 514(a) preempted the Minnesota law.

We can see no sound reason to decline to follow *Minnesota* here. The state statute at issue in that case is virtually identical to the HRL.[11] Moreover, the ERISA preemption issue was squarely presented to the

---

**10.** In *Minnesota*, the Minnesota Supreme Court relied on what has become known as the "double savings clause argument" in holding that ERISA did not preempt the state's fair employment practices law. ERISA § 514(d), 29 U.S.C. § 1144(d), exempts other federal laws, including Title VII, from supersedure by ERISA. Title VII, in turn, exempts state fair employment practice laws from preemption by Title VII. 42 U.S.C. § 2000e–7. The double savings clause argument holds that the net effect of these two provisions is to exempt such state laws from preemption by ERISA. *See Minnesota, supra; Mountain States, supra*. In affirming on the basis of the district court's opinion in *Pervel, supra*, we rejected this statutory argument.

*See* 468 F.Supp. at 493. We reiterate that rejection here, as we are free to do since the Supreme Court's summary affirmance in *Minnesota* did not adopt the state court's reasoning in that case, *see Mandel v. Bradley, supra*, 432 U.S. at 176, 97 S.Ct. at 2240.

**11.** It is immaterial that the Minnesota statute explicitly prohibited the denial of pregnancy benefits while the HRL took on this meaning only through judicial interpretation. The net effect of the statutes is exactly the same, and ERISA § 514(c), 29 U.S.C. § 1144(c), defines the state laws subject to preemption as including court decisions.

Supreme Court in the appeal papers, and the appeal was plainly within the Supreme Court's obligatory appellate jurisdiction under 28 U.S.C. § 1257(2) (1976). We can discern no possible basis for the *Minnesota* dismissal other than a holding that ERISA does not preempt a state law requiring that disability benefits plans treat pregnancy the same as other disabling conditions. Therefore, *Minnesota* requires us to uphold the HRL against the ERISA challenge mounted here.

The plaintiffs' arguments for a contrary course are unpersuasive. For the most part, plaintiffs reiterate the Supreme Court's cautionary remarks about the danger of reading summary decisions too broadly, citing, *e. g., Illinois State Bd. of Elections v. Socialist Workers Party, supra,* 440 U.S. at 183, 99 S.Ct. at 990. While we have recognized this danger in our own decisions, *see, e. g., New York Telephone Co. v. New York State Dep't of Labor,* 566 F.2d 388, 391 n.2 (2d Cir. 1977), *aff'd,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979); *In re Letourneau,* 559 F.2d 892, 893 n.4 (2d Cir. 1977), our analysis has satisfied us that the issue presented in the instant case is virtually identical to that decided in *Minnesota.* Moreover, while it is true, as plaintiffs note, that summary actions carry less precedential weight in the Supreme Court than do decisions rendered with opinion after argument, *see, e. g., Washington v. Yakima Indian Nation, supra,* 439 U.S. at 476–77 n.20, 99 S.Ct. at 749–50 n.20; *Edelman v. Jordan,* 415 U.S. 651, 670–71, 94 S.Ct. 1347, 1359–60, 39 L.Ed.2d 662 (1974), it is also true that "the privilege of disregarding even summary Supreme Court holdings rests with that court alone," and not with us. *Doe v. Hodgson,* 500 F.2d 1206, 1207–08 (2d Cir. 1974).

■ Plaintiffs also argue that the timing of the *Minnesota* dismissal weakens its precedential force. The Supreme Court dismissed the appeal in *Minnesota* exactly one week after it had denied certiorari in both

*Pervel, supra,* in which we summarily struck down under ERISA a Connecticut pregnancy benefits law, and *Bucyrus-Erie Co. v. Department of Industry, Labor & Human Relations,* 599 F.2d 205 (7th Cir. 1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980), in which the Seventh Circuit, taking the opposite view, rejected an ERISA-based challenge to a similar Wisconsin statute. Because the Court let stand these divergent circuit court rulings at a time when it could easily have remanded them for further consideration in light of the forthcoming affirmance in *Minnesota,* plaintiffs conclude that the Justices did not intend "to create a unified body of precedent on the ERISA preemption issue," Brief on Appeal at 14, and that *Pervel* therefore retains its vitality in this Circuit, *Minnesota* notwithstanding.

We reject this contention. Like the plaintiffs, we find the sequence of events described above rather mystifying. Nonetheless, it remains the law that dismissals of appeals are binding precedents, while denials of certiorari have no precedential force. *Compare Hicks v. Miranda, supra, with Maryland v. Baltimore Radio Show, Inc.,* 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950) (opinion of Frankfurter, J., with respect to denial of certiorari). *See generally* R. Stern & E. Gressman, Supreme Court Practice §§ 4.31, 5.7 (5th ed. 1978); Linzer, *The Meaning of Certiorari Denials,* 79 Colum.L.Rev. 1227 (1979). Although courts have sometimes disregarded the latter rule on the ground that special circumstances surrounding a particular denial of certiorari revealed the Justices' view of the merits, *see* Linzer, *supra,* at 1277–91, we see no reason for such an undertaking here, where the denials have tended more to obscure than to illuminate the Court's position.

Accordingly, we hold that the HRL was not preempted by ERISA.

B. *HRL and Title VII*

■ We turn next to the airlines' contention that Title VII [12] preempted the HRL

---

12. The airlines also sued under the Equal Pay Act, 29 U.S.C. § 206(d), and under Executive Order No. 11246. The operative principles of these provisions are identical to those of Title VII and we do not consider them separately.

during the periods at issue here. Title VII forbids employers to "discriminate" against their employees "because of ... sex." 42 U.S.C. § 2000e–2(a)(1), (2). Generally speaking, the statute prohibits not only those employment practices designed to discriminate on proscribed grounds, but also those facially neutral practices that have the effect of discriminating on such grounds.[13] *See generally Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Plaintiffs argue that by compelling employers to provide disability benefits for their pregnant employees, all of whom are necessarily female, the HRL mandated discrimination against *male* employees "because of ... [their] sex," in violation of Title VII. If the HRL mandated discrimination that was unlawful under Title VII during the relevant time period, then, of course, it was invalid under the Supremacy Clause.[14] We hold, however, that the HRL was entirely lawful under Title VII.[15]

In contending that the HRL contravened Title VII, the airlines rely primarily on *General Electric Co. v. Gilbert, supra*, in which the Supreme Court held that the exclusion of pregnancy from coverage under a disability plan did not discriminate against women in violation of Title VII. In reaching this conclusion, the Court observed that the "package" of fringe benefits provided under the employer's plan was "facially nondiscriminatory in the sense that '[t]here is no risk from which men are protected and women are not.'" 429 U.S. at 138, 97 S.Ct. at 409, quoting *Geduldig v. Aiello*, 417 U.S. 484, 496–97, 94 S.Ct. 2485, 2491–92, 41 L.Ed.2d 256 (1974) (*see* note 4 *supra*). In addition, the Court noted that the plan did not have a discriminatory effect upon women:

As there is no proof that the package [of insurance benefits] is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme simply because women disabled as a result of pregnancy do not receive benefits; that is to say, gender-based discrimination does not result simply because an employer's disability-benefits plan is less than all-inclusive.... [P]regnancy-related disabilities constitute an *additional* risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike, which results from the facially evenhanded *inclusion* of risks.

429 U.S. at 138–39, 97 S.Ct. at 409–10 (emphasis in original).

From the quoted language, the airlines derive their two principal arguments. First, they argue that the pre-1979 inclusion of pregnancy as a covered condition under their disability plans would have been unlawful under Title VII because it would have destroyed the plans' "facially evenhanded inclusion of risks." Second, they contend that the provision of pregnancy benefits would render the "package" of benefits under a plan more valuable to women than to men, so that the plan would have the unlawful effect of discriminating against men in their compensation because of their sex.

█ The airlines' first argument is easily disposed of. That *Gilbert* held the exclusion of pregnancy benefits to be nondiscriminatory does not compel the conclusion that the inclusion of such benefits is necessarily discriminatory. The *Gilbert* Court itself, quoting *Geduldig v. Aiello, supra*, 417

---

13. Title VII insulates an employer from liability if he can show that a neutral practice having a discriminatory effect is justified by business necessity. *See, e. g., Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). No party has contended that this exception applies in the present appeal.

14. Section 708 of Title VII, 42 U.S.C. § 2000e–7, provides that Title VII does not preempt any state law "other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice" under Title VII.

15. Because these issues are purely legal and have been extensively briefed by the parties, we proceed to resolve them here, without need for a remand.

U.S. at 496–97 n.20, 94 S.Ct. at 2491–92 n.20, explicitly observed that classifications based on pregnancy are not facially discriminatory:

> Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.
>
> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and non-pregnant persons. While the first group is exclusively female, the second includes members of both sexes.

429 U.S. at 134–35, 97 S.Ct. at 407–08. Therefore, the inclusion of pregnancy benefits is no more "discriminatory per se" than was their exclusion.

To evaluate plaintiffs' second argument, that a disability plan complying with the HRL has a discriminatory effect upon men, we must review the allegations of the complaint. The airlines alleged, and we must therefore accept as true for these purposes, that the disability benefits provided their male and female employees during the relevant period were "fairly equivalent in value in terms of dollar benefits paid per salary dollar," and that their employees were "covered equally under the [disability] plans," regardless of sex, for all disabilities unrelated to pregnancy. They alleged further that the provision of pregnancy benefits pursuant to the HRL would have increased the value of the disability "package" to women without providing a corresponding increase to men. Therefore, plaintiffs conclude, the New York statutes had the unlawful effect of mandating discrimination against men on the basis of their sex.

This argument is unfounded. Although we must accept plaintiffs' factual allegations as true, we need not assume the truth of conclusions of law or unwarranted factual inferences that they have pleaded. *See generally* 2A Moore's Federal Practice ¶ 12.08, at 2266–69 (2d ed. 1980). The airlines' characterization of the "value" of disability benefits to their employees falls into the latter category. The "value" of a disability plan as an item of compensation for an individual worker is not the amount of benefits payable to that worker in the event of disability. Rather, it is the worker's pro rata share of the total cost of providing disability coverage, which in turn equals the sum of the plan's total payout and expenses.[16] Plaintiffs have not alleged that the HRL would require male employees to pay greater individual pro rata shares of the total cost of coverage. The increase in total cost occasioned by the inclusion of pregnancy benefits, and the corresponding increase in the plan's value as an item of compensation, is uniformly spread among all employees. Because this increase is uniform for all, it can hardly be said to have a discriminatory effect upon men. *Cf. City of Los Angeles Dep't of Water & Power v. Manhart, supra.*

Similarly, we reject the airlines' contention that a plan complying with the HRL has a discriminatory effect upon men because they will never receive the pregnancy benefits for which they have paid. Large numbers of women will be equally empty-handed. Under the HRL, all workers bear the cost of payments to the comparatively few who become disabled through pregnancy. The cost of these benefits does not depend upon the number of women in the employer's labor force, but upon the number of women who become pregnant. The latter variable is not a function solely of

---

**16.** The benefits payable in the future have no present value, being a mere expectancy, contingent upon the occurrence of an insured risk. Therefore, in a plan where the employer bears the full cost of providing benefits, the value of the plan is equal to the cost to the worker of purchasing equivalent coverage directly from an insurer. To the extent that the employee pays for some or all of the cost of insurance, the value of the plan is the difference between the lower cost of purchasing group insurance and that of purchasing individual coverage.

their sex, as the airlines would have it, but as well of age and marital status.[17] In short, the HRL did not require employers to discriminate against men on the basis of their sex and was therefore not unlawful under Title VII.

## C. *HRL and the RLA*

■ Finally, we consider the airlines' contention that the HRL was preempted by the RLA.[18] The RLA governs the collective bargaining agreements between the airlines and their employees pursuant to which the disability plans at issue here were established. Plaintiffs argue that by mandating pregnancy coverage not otherwise available under its collective bargaining agreements, the HRL unlawfully alters the terms of those agreements and impermissibly interferes with the collective bargaining processes established by the RLA. We disagree.[19]

In *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court set forth the basic framework of analysis for questions of federal labor law preemption. First, "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate" are either protected or proscribed by federal law, then "due regard for the federal enactment requires that state jurisdiction must yield." *Id.* at 244, 79 S.Ct. at 779. Second, even if a state law touches upon conduct arguably governed by the federal scheme, the state may nevertheless regulate that conduct if it is "a merely peripheral concern" of the federal law, or if it involves "interests so deeply rooted in local feeling and responsibility

that, in the absence of compelling congressional direction, [the court] could not infer that Congress had deprived the States of the power to act." *Id.* at 243–44, 79 S.Ct. at 778–79 (footnote omitted). Courts must carefully examine both the state interest in regulating the conduct at issue and the potential for interference with the federal regime. *Farmer v. United Brotherhood of Carpenters, Local 25,* 430 U.S. 290, 297, 300–01, 97 S.Ct. 1056, 1061, 1063–64, 51 L.Ed.2d 338 (1977). Ultimately, however, the question is one of congressional intent. *Garmon, supra,* 359 U.S. at 239–40, 79 S.Ct. at 776–77.

■ At the outset, the airlines raise a contention that would divert us from this task of statutory analysis. Relying upon *Railway Employees' Dep't v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), and *California v. Taylor,* 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957), they argue that the terms of their collective bargaining agreements, by themselves, override the HRL. Quoting *Hanson,* plaintiffs assert:

> A union agreement made pursuant to the Railway Labor Act has . . . the imprimatur of the federal law upon it and, by force of the Supremacy Clause of Article VI of the Constitution, could not be made illegal nor vitiated by any provision of the laws of a State.

351 U.S. at 232, 76 S.Ct. at 718. *See also Taylor, supra,* 353 U.S. at 561, 77 S.Ct. at 1042 (RLA collective bargaining agreement "would take precedence over conflicting provisions" of state law). Because the air-

---

17. Contrary to the airlines' contention, our disposition of the Title VII claims does not dispense with disparate impact analysis in employment discrimination litigation. We recognize that the Supreme Court's decisions in *Gilbert* and *Manhart, supra,* are somewhat difficult to reconcile in their application of disparate impact analysis to insurance schemes. Nonetheless, that analysis plainly remains valid in employment discrimination cases. We reject the airlines' argument because it improperly defines the group that feels the impact of the New York statutes.

18. We reject the argument that the Supreme Court's dismissal of the appeal in *Mountain States, supra,* is dispositive of the RLA preemption issue. The labor law preemption claim in *Mountain States* was based upon the Labor Management Relations Act, 29 U.S.C. §§ 141 *et seq.,* not upon the RLA. *Mountain States* therefore does not govern this case, *cf. Mandel v. Bradley, supra,* and we are free to examine the question in depth.

19. As with the airlines' Title VII preemption arguments, we believe that the issues raised respecting the RLA are purely legal, and we resolve them here.

lines' collective bargaining agreements were negotiated pursuant to the RLA, they contend that the agreements themselves supersede state law, so that New York was powerless to require the insertion, through the HRL, of terms concerning disability benefits that the parties themselves had omitted.

*Hanson* and *Taylor* do not stand for so sweeping a proposition. *Hanson* involved the application of a state "right to work" law, which forbade agreements requiring employees to join a union, to a collective bargaining agreement that contained an express "union shop" clause requiring union membership. The RLA expressly permitted unions to negotiate such union shop agreements "[n]otwithstanding any ... statute or law ... of any State." 45 U.S.C. § 152 (Eleventh). The essential point was that the state law conflicted with the terms of the RLA itself, not merely with an agreement negotiated under the RLA. *Taylor* involved an attempt by state authorities to subject employees of a state-owned railroad to the state civil service law, which forbade collective bargaining, despite the fact that the employees were then covered by a collective bargaining agreement negotiated with the state pursuant to the RLA. The Court held that the RLA applied to the state as employer, and that its conflicting civil service laws were therefore preempted. 353 U.S. at 561–68, 77 S.Ct. at 1042–46. As the *Taylor* Court's discussion of *Hanson* makes plain, the existing collective bargaining agreement would "take precedence over" the state civil service laws because those laws were invalid, as applied to the railroad, under the RLA itself. *Id.* at 560–61, 77 S.Ct. at 1041–42. We must therefore determine the validity of the New York statute by ascertaining the intent of Congress, not merely by perusing the airlines' agreements with their workers.

Nothing in the RLA clearly addresses the permissibility of state regulation such as the HRL. Among other things, the RLA places upon employers a duty to bargain, empowers employees to organize and select representatives, establishes administrative bodies for the resolution of disputes, and

prescribes certain rules concerning union security agreements, dues check-offs, and the like. 45 U.S.C. §§ 152, 153, 154. With very few exceptions, it permits parties to collective bargaining to adopt whatever terms are mutually satisfactory. We must therefore scrutinize the New York statutes in terms of their potential for interfering with the federal scheme and the strength of the state interests they reflect. *See, e. g., Garmon, supra; Farmer, supra.*

The RLA protects and vigorously promotes the collective bargaining process. *See, e. g., Taylor, supra*, 353 U.S. at 559, 77 S.Ct. at 1040, and cases cited. Thus, the airlines' most telling argument against the HRL is that it impermissibly curbs the parties' freedom to bargain over fringe benefits, a concededly valuable item of compensation. As the airlines note, "[t]he inclusion or noninclusion of a substantial economic benefit in a collectively bargained compensation package goes to the heart of the bargaining process." (Brief on Appeal at 38). Moreover, it is generally true that state laws designed to alter the terms of a collective bargaining agreement, *see Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 153, 96 S.Ct. 2548, 2559, 49 L.Ed.2d 396 (1976), or to adjust the economic relations of parties to collective bargaining, *see Local 24, International Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 297, 79 S.Ct. 297, 305, 3 L.Ed.2d 312 (1959), are inconsistent with federal policies protecting the bargaining process. At first glance, therefore, the HRL does seem to intrude impermissibly upon an area that Congress has reserved for private negotiation.

Nonetheless, closer inspection of the complex of state and federal interests at stake persuades us that the HRL is fully valid under the RLA. First, it is consistent with prevailing federal policies concerning employment relations. The RLA, like other federal labor statutes, does not address the problem of employment discrimination. *Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc.*, 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963). *See also*

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII remedies operate independently of arbitration process established under collective bargaining agreement). Thus the fact that state antidiscrimination laws have some effect on collective bargaining under the RLA does not automatically invalidate them. We must look to other federal laws that govern employment discrimination in order to gauge their harmony with the overall federal scheme. *Cf. Malone v. White Motor Corp.*, 435 U.S. 497, 504–05, 98 S.Ct. 1185, 1189–90, 55 L.Ed.2d 443 (1978) (federal pension legislation provides "far more reliable" guide to legislative intent than does the National Labor Relations Act in determining validity of state statute affecting pension plan established by collective bargaining). Title VII, the principal federal employment discrimination law, indicates that the HRL is and was in accordance with the federal scheme. Although the practices prohibited by the state statute were not prohibited by Title VII prior to its amendment in 1978, *see General Electric Co. v. Gilbert, supra*, Title VII permits the states to adopt antidiscrimination measures more stringent than its own, *see* 42 U.S.C. § 2000e–7, and vigorous enforcement of state fair employment laws by state agencies is an integral part of the federal scheme, *see* 42 U.S.C. § 2000e–5(b), (c), (d), (e). The HRL is precisely the sort of state law that Congress had in mind. It provides protections beyond the federal minimum and establishes orderly administrative procedures for enforcing those protections. Thus, far from offending the principal federal regime in point, the HRL actually promoted it.

Furthermore, the statute reflects strong state interests and policies. As Title VII itself recognizes, the states have an abiding interest in eradicating employment discrimination. Title VII permits the states to act not only against forms of discrimination that have afflicted the nation as a whole, but also against those that are peculiarly

local in character or peculiarly harmful in their local effects. New York has decided that the denial of certain minimum benefits for workers disabled by pregnancy contravenes its own policy of sheltering women from the economic dislocations otherwise attendant upon childbirth. *Brooklyn Union Gas Co., supra; Union Free School District No. 6 v. New York State Human Rights Appeal Board*, 35 N.Y.2d 371, 362 N.Y.S.2d 139, 320 N.E.2d 859 (1974). Nothing in that choice offends the RLA.

Accordingly, we hold that the HRL was not preempted by the RLA.

## III. ENFORCEABILITY OF THE DBL

We turn finally to the question whether federal law forbids enforcement of the DBL with respect to the airlines' employee benefit plans. While we agree with the district court's view that neither Title VII nor the RLA preempts the DBL, we are constrained to conclude that the DBL may well be preempted by ERISA.

### A. *DBL and Title VII*

█ In rejecting the airlines' contention that the DBL is preempted by Title VII, the district court took the view that the DBL does not create a sex-based classification by mandating minimum benefits for pregnancy-related disability, and that it does not have the prohibited effect of compelling employers to compensate employees at different rates on the basis of their sex. 485 F.Supp. at 309–11. We agree. Plaintiffs' contentions with regard to the DBL are substantively identical to their arguments with regard to the HRL,[20] and our discussion in Part II.B. above as to why Title VII did not preempt the HRL applies with equal force to the DBL.

### B. *DBL and the RLA*

█ In rejecting the airlines' contention that the DBL is preempted by the RLA, the district court reasoned that the DBL reflects a state interest in eliminating sex

---

**20.** The fact that the DBL mandates specific minimum benefits while the HRL theoretically does not has no significance in this analysis. New York could permissibly conclude that minimum benefits are necessary to protect women from discrimination.

discrimination that is "so deeply rooted in local feeling and responsibility" that Congress could not have intended to preempt it. 485 F.Supp. at 308–09.

Although we agree with the airlines that the DBL is not necessarily a law of the sort "so deeply rooted in local feeling and responsibility" as to fall within the second exception of *San Diego Building Trades Council v. Garmon, supra;* cf. *Lodge 76, supra,* 427 U.S. at 137 n.2, 96 S.Ct. at 2551 n.2 ("local interest" exception predicated on state's power over "such traditionally local matters as public safety and order and the use of streets and highways"), our agreement does not mean that plaintiffs' RLA contention should be upheld. The local interest exception applies only when the disputed state law governs conduct that comes within the ambit of federal labor law. For the reasons we have discussed in Part II.C. above with respect to the HRL, we conclude that the DBL governs matters outside the intended reach of the RLA and that the RLA therefore does not preempt the DBL.

C. *The DBL and ERISA*

We turn finally to the question whether the DBL is preempted by ERISA. We do not consider this issue to be foreclosed in the Board's favor by our holding above concerning the validity of the HRL under ERISA. Unlike the HRL and the state statutes upheld against ERISA preemption in *Minnesota* and *Mountain States, supra,* the DBL does not merely forbid employers to discriminate against workers disabled through pregnancy, but instead affirmatively requires employers to provide minimum pregnancy benefits. Because the DBL thus differs from the "pure" antidiscrimination laws upheld in *Minnesota* and *Mountain States,* those decisions are not controlling with respect to it, and we must make an independent review of its validity.

*Cf. Mandel v. Bradley, supra,* 432 U.S. at 176, 97 S.Ct. at 2240.

Nor is the issue of ERISA preemption foreclosed by our analysis of the validity of the HRL and DBL under the RLA. It is true that ERISA does not address problems of sex discrimination any more than does the RLA, so that the analysis of state and federal interests presented with respect to the RLA would apply with equal force to ERISA, absent any other indications of congressional intent. Unlike any provision of the RLA, however, ERISA § 514(a) explicitly addresses the preemption question. Thus, in considering that question, we cannot rely solely upon the general policy considerations which lead us to uphold the HRL and DBL under the RLA. Instead, we must seek to divine the intent of Congress as expressed in § 514(a).

The airlines' principal contention is that insofar as the DBL requires employers to provide minimum benefits for pregnancy-related disabilities, it "relate[s] to" employee benefit plans within the meaning of § 514(a) of ERISA and is therefore invalid.[21] The Board's principal response is that the DBL does not "relate to" such plans in the manner Congress contemplated, so that § 514(a) is inapplicable to it. The district court did not rule on this question; it held instead that ERISA § 4(b)(3) exempted the disputed portions of the airlines' plans from regulation under ERISA, so that ERISA § 514(a) had no bearing on the case. Our own views, however, compel us to begin with the proper construction of § 514(a). We agree with the plaintiffs that the section is broad enough to encompass the DBL.

■ Section 514(a) explicitly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[22] Despite the apparent all-

21. Section 514(a) is set out in note 7 *supra.*

22. Section 514(a) does not use the term "preempt." Instead, it provides that ERISA "shall supersede" state laws relating to benefits plans. Although it might be argued that "supersede" has a narrower meaning than "preempt," *see* Brummond, *Federal Preemption of State Insurance Regulation Under ERISA,* 62

Iowa L.Rev. 57, 67 (1976), the legislative history indicates that Congress used "supersede" as an equivalent of "preempt" and that the legislature assigned the term a very broad meaning. See our review of the legislative history *infra.* *See also Wadsworth v. Whaland,* 562 F.2d 70, 76–77 (1st Cir. 1977), *cert. denied,* 435 U.S. 980, 981, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978).

inclusiveness of this language, the Board argues that only laws governing ERISA's own subject matter—funding, vesting, disclosure, and the like—actually "relate to" benefit plans in the manner Congress intended. Because the DBL addresses only the level of benefits provided, a matter ungoverned by ERISA, the Board contends that § 514(a) is inapplicable to it.

Our review of the legislative history leads us to conclude that the statute is as sweeping as it seems. As other courts have noted, the legislative history of ERISA supports a broad reading of the phrase "relate[s] to" in § 514(a). The preemption provisions of the bills that preceded ERISA applied only to state laws that regulated ERISA's specific subject matters. *See* H.R. 2, § 514(a), (c), 93d Cong., 1st Sess. (1973), *reprinted in* 120 Cong.Rec. 4742 (1974) (House version); H.R. 2, § 699(a), 93d Cong., 1st Sess. (1973), *reprinted in* 120 Cong.Rec. 5002 (1974) (Senate version). The present language of § 514(a) was adopted by the Conference Committee, whose report indicated that the provision was as broad as its language. H.R.Conf. Rep. No. 93–1280, 93d Cong., 2d Sess. 383, *reprinted in* [1974] U.S.Code Cong. & Ad. News, 4639, 5038, 5162. Statements in both Houses of Congress emphasized the breadth of federal preemption. *See* 120 Cong.Rec. 29197 (1974) (remarks of Rep. Dent) (§ 514(a) "reserv[es] to Federal authority the sole power to regulate the field of employee benefit plans"; conferees applied preemption principle "in its broadest sense"); *id.* at 29933 (remarks of Sen. Williams) (§ 514(a) "intended to preempt the field for Federal regulations"); *id.* at 29942 (remarks of Sen. Javits) (conference version adopted to avoid litigation concerning scope of narrower provisions of predecessor bills). Thus, most courts of appeals that have considered the issue have held that the phrase "relates to" in § 514(a) does not limit the provision to those state laws that are directed toward ERISA's subject matter. *See Buczynski v. General Motors Corp.*, 616 F.2d 1238, 1250 (3d Cir.), *cert. granted*, —— U.S. ——, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980); *Wadsworth v. Whaland*, 562 F.2d 70, 76–77 (1st Cir. 1977), *cert. denied*, 435 U.S. 980, 981, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978); *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294, 1298–1300 (N.D.Cal.1977), *aff'd per curiam*, 571 F.2d 502 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). *Cf. Marshall v. Chase Manhattan Bank*, 558 F.2d 680, 683 (2d Cir. 1977). *See also* Hutchinson & Ifshin, *Federal Preemption of State Law Under the Employee Retirement Income Security Act of 1974*, 46 U.Chi.L.Rev. 23, 38–43 (1978).

We agree with this interpretation. A state law "relate[s] to" employee benefit plans, and is thus subject to preemption, whenever it has a direct bearing on such plans, not merely when it parallels the federal scheme for regulating them.[23] By prescribing minimum plan benefits, the DBL plainly "relate[s] to" employee benefit plans in the manner contemplated under § 514(a). Therefore, it may be preempted under that section.

That the DBL provisions are within the purview of § 514(a), however, does not necessarily mean that they are preempted, for § 514(a) excepts from preemption state laws that "relate to" benefit plans that are themselves exempted from coverage under ERISA by ERISA § 4(b).[24] Section 4(b)(3) exempts from ERISA coverage any "plan" that is "maintained solely for the purpose of complying with applicable . . . disability insurance laws." The Board contends that the DBL is exempted from preemption by this provision.

---

**23.** This holding is not inconsistent with our ruling in *American Tel. & Tel. Co. v. Merry*, 592 F.2d 118 (2d Cir. 1979). *Merry* held that ERISA did not preempt the application of a state garnishment law to payments from a pension plan regulated under ERISA. As we noted, a reading of § 514(a) broad enough to include local garnishment laws would "lead to the unreasonable conclusion that Congress intended to preempt even those state laws that only in the most remote and peripheral manner touch upon" ERISA-regulated plans. *Id.* at 121. By contrast, the DBL's relation to benefits plans is anything but "remote and peripheral." It regulates the benefits provided under such plans.

**24.** Section 4(b) is set out in note 8 *supra*.

The Board's argument begins with the premises, not challenged here, that the pregnancy provisions of the DBL are "disability insurance laws" within the meaning of § 4(b)(3), and that the airlines would not provide pregnancy benefits for their employees if they were not compelled to do so by the DBL. Thus, the Board contends, any portions of the airlines' benefits plans devoted to pregnancy benefits would be maintained "solely" for purposes of complying with the DBL. If this is so, the argument continues, then these portions of the plans are exempt from regulation under ERISA by virtue of § 4(b)(3). If they are exempt under § 4(b), then the DBL continues to govern them, notwithstanding § 514(a).

This argument assumes that the word "plan" as used in § 4(b)(3) can be read to mean either a whole plan or a portion of a plan, such as the specific pregnancy provisions the Board seeks to impose upon the airlines. In ruling for the Board on this issue, the district court accepted this assumption. Reasoning that ERISA contemplates "independent and concurrent obligations" under federal and state law, the court held that "those provisions of an employee plan which are maintained to comply with [state disability insurance] laws are excluded from ERISA." 485 F.Supp. at 307. In attacking the district court's ruling, the airlines argue that "plan" must mean a benefits plan in its entirety, and that their "plan[s]" were adopted largely for competitive reasons, not "solely" to comply with the DBL. In the airlines' view, § 4(b)(3) was intended to exempt small, intrastate employers whose "plan[s]" are designed only to meet the minimum requirements of state law.

We think the district court took an unduly expansive view of the role that ERISA assigns to state law in governing employee benefit plans. As discussed above, ERISA contemplates a federal occupation of the regulatory field that is very nearly total. Section 514(a) was meant to clear away all state laws bearing on benefits plans, and the various exceptions to the general rule of federal preemption were meant to be "narrow." 120 Cong.Rec. 29933 (1974) (remarks of Sen. Williams); id. at 29197 (remarks of Rep. Dent). We recognize that many aspects of benefits plans generally, and of welfare benefits plans in particular, will go unregulated under this regime of broad preemption, and that § 514(a) may therefore permit abuses that Congress might otherwise have wished to avert. See generally Brummond, *Federal Preemption of State Insurance Regulation Under ERISA*, 62 Iowa L.Rev. 57 (1976).[25] Nonetheless, it is clear that Congress sought to. stay the states' hands, at least for a certain period, with the thought that "appropriate modifications" could be made if later shown to be needed. See 120 Cong.Rec. 29942 (1974) (remarks of Sen. Javits). See also 29 U.S.C. § 1222(a)(4); H.R.Conf.Rep.No.93–1280, *supra*, at 361, *reprinted in* [1974] U.S.Code Cong. & Ad.News at 5140 (Joint Pension Task Force to study "effects and desirability" of ERISA preemption policy). Thus, ERISA ordinarily does not permit "independent and concurrent obligations" under federal and state law. Under ERISA, federal law will govern, even in those instances where federal governance effectively means no governance, save where Congress has clearly declared otherwise.

■ With these principles in mind, we conclude that the word "plan" as used in § 4(b)(3) refers to a plan as an integral unit, not to isolated and subsidiary provisions of a plan. The plain terms of the statute refer to "plan[s]," not to portions or provisions of a plan. Moreover, permitting the fragmentation of the term "plan" would disrupt the uniformity that Congress sought to achieve through § 514(a), allowing a state to remove specific disability provisions of a com-

---

**25.** Of the various ERISA provisions, only those governing disclosure and fiduciary standards are applicable to employee welfare benefit plans. 29 U.S.C. §§ 1021–1031 (disclosure); *id.* §§ 1101–1112 (fiduciary standards). Other provisions governing vesting, participation, and funding requirements apply only to certain employee pension benefit plans. *See id.* §§ 1051(1), 1081(a)(1). *See generally* Brummond, *supra*, at 60–63.

plex benefits scheme from coverage under ERISA merely by legislating on a particular subject. For a nationwide employer, those provisions might be subject to New York's DBL, yet also subject to ERISA requirements in states without "applicable . . . disability insurance laws," and subject to further, and probably conflicting, requirements imposed by other states that do have such laws. Congress could scarcely have intended to permit such successive layers of regulation to be imposed on certain portions of a plan otherwise subject in its entirety to ERISA alone. Thus we conclude that "plan" refers to an integral unit or program, not to selected provisions.

■ This does not necessarily mean that the airlines are entitled to relief against enforcement of the pregnancy provisions of the DBL. While we reject the argument that those provisions alone enable the Board to compel plaintiffs to provide minimum pregnancy benefits, the Board may be empowered to do so by the DBL as a whole. If a plaintiff's disability "plan" as a whole is maintained "solely" to comply with the requirements of the DBL as a whole, then that plan in its entirety would be exempted from ERISA under § 4(b)(3). With respect to such a plan, the Board would be free to enforce all provisions of the DBL, including those that govern pregnancy, § 514(a) notwithstanding. Because it is entirely possible that some or all of the plaintiffs do maintain disability "plan[s]" adopted "solely" to comply with the DBL, we must give content to those statutory terms.

Nothing in the legislative history of ERISA explicitly addresses the purpose of the § 4(b)(3) exemption.[26] Nonetheless, Congress's thought seems fairly clearly to have been that "plan[s]" adopted "solely" to comply with state social insurance laws were adequately regulated by state authorities and that state regulation of such plans would not unduly disrupt the ERISA scheme. In determining the meaning of the troublesome terms "plan" and "solely," it will be helpful to examine the characteristics of the social insurance programs potentially affected by § 4(b)(3).[27]

Unemployment insurance systems function in substantially the same manner in every state. Each state requires employers to contribute to a central unemployment fund. The fund is a state agency that superintends collections from employers and pays stated benefits to idled workers.[28] Some states permit employers to provide supplemental unemployment benefits through private arrangements, but such supplemental plans are wholly independent of the state fund. They provide benefits in addition to those available from the state fund and their establishment does not relieve the employer of his obligation to contribute to the state fund. *See generally* 1B Unempl.Ins.Rep. (CCH) ¶ 2300.

Workmen's compensation systems are more diverse. Some follow the pattern established by unemployment insurance legislation and permit an employer to satisfy his obligations under state law only by participation in a state-administered insurance fund. Others permit employers to choose between participation in the state fund and the establishment of equivalent coverage through private means, as by purchasing

---

**26.** Section 4(b)(3) closely parallels § 4(b)(2) of the Welfare and Pensions Plan Disclosure Act of 1958, 29 U.S.C. § 303(b)(2) (repealed by ERISA), which exempted from regulation under that act "plan[s] . . . established and . . . maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation disability insurance laws." The legislative history of the WPPDA reveals as little about the meaning of these terms as does that of ERISA.

**27.** Section 4(b)(3) applies to workmen's compensation plans and unemployment insurance

plans as well as disability plans. *See* note 8 *supra.*

**28.** This uniformity in administrative methods flows from the Federal Unemployment Tax Act, I.R.C. §§ 3301–3311, which imposes a payroll tax upon employers but also provides a substantial credit against this tax for payments made to a qualifying state unemployment fund. The state fund must have the characteristics specified in *id.* § 3306(f). In other respects, particularly in the level of benefits provided, state unemployment insurance systems differ widely.

insurance, establishing a trust or other fund, or maintaining a plan of self-insurance. Many states have no state fund and merely require employers to make satisfactory private arrangements. Where private arrangements are permitted, they are generally subject to review and approval by state authorities. *See generally* 4 A. Larson, The Law of Workmen's Compensation § 92.10 (1980).

The comparatively few states that have disability insurance laws have varying requirements. One, Rhode Island, establishes participation in a state fund as the exclusive means of compliance. Most give employers the option to participate in a state-administered fund or to provide alternate private arrangements, subject to approval by state authorities. *See generally* 4 A. Larson, *supra*, §§ 96.40, 97.42. New York falls into the latter mold. Employers may discharge their obligation to provide disability benefits by participating in a state fund that is financed by employer and employee contributions. N.Y.Work.Comp.Law §§ 209, 210, 211(1), 214. Alternatively, employers may provide the required benefits through private insurance, a plan of self-insurance, or other "plan or agreement," subject to the Board's approval. N.Y.Work. Comp.Law § 211(2), (3), (4), (5) (McKinney 1965 & Supp.1980–1981). The Board will approve a private disability benefits program if it provides benefits "at least as favorable" to employees as those provided by the state fund. *Id.* § 211(5); 12 N.Y.C. R.R. §§ 375.1, 358–3.1 (regulations governing approval of alternate plans).

It is relatively easy to see how Congress would classify the programs at the extreme ends of this spectrum of social insurance schemes. At one end of the spectrum are employers whom the state compels to participate in state-administered funds as the exclusive means of providing protection for their employees. In this situation, state regulation is quite comprehensive and presumably suffices to protect workers' interests. In addition, the centralization of the state's regime sharply diminishes its potential for disrupting the federal scheme under ERISA. Thus, when the state compels participation in a state-administered fund, the policies of the § 4(b)(3) exemption are fully satisfied. In the language of § 4(b)(3), the employer's program for complying with such a state law will constitute his "plan," and that plan will have been adopted "solely" to comply with the state law.

At the opposite end of the spectrum are employers who provide a type of benefit commonly associated with social insurance schemes, but who do so voluntarily, with no compulsion by the state. Because such programs are not closely supervised by the state, they are far more susceptible to abuse than are compulsory, state-administered programs. Moreover, because such voluntary programs are typically part of a complex benefits scheme established through collective bargaining, state efforts to regulate them pose a significant risk of conflict with ERISA requirements. The policies of § 4(b)(3) do not apply to such programs, and § 514(a) would ordinarily preempt state laws purporting to regulate them. Particularly because state law does not compel employers to establish programs of this sort, it would be sensible to say, in the language of § 4(b)(3), that such programs are not maintained "solely" to comply with state laws, even if they do constitute separate "plan[s]."

The troublesome cases, falling in the middle of the spectrum, arise when state laws compel an employer to maintain *some* program, but permit him to satisfy this obligation through private arrangements that may vary from, and exceed, the state-mandated norms. In such cases, the nature and scope of the program sought to be regulated by state authorities will largely determine whether state regulation comports with ERISA policies. If the employer's program for providing the particular benefit comprises a separate administrative unit, as where an employer insures his employees against disability through a single group policy or establishes a separate disability trust, then state authorities can adequately police that unit without affecting federal authority to regulate programs for other types of benefits. If, however, the employ-

er's program encompasses types of benefits besides those reserved to state authority under § 4(b)(3), and if the various benefits are administered through a single vehicle, then state regulation may quickly run afoul of federal policies. The unit selected by the employer for administering the complex benefits scheme would be subject to state requirements insofar as it provided benefits enumerated in § 4(b)(3), but subject to federal requirements insofar as it provided other types of benefits. As we noted above, ERISA does not permit such regulatory disharmony.

■ Thus, we think that the word "plan" as used in § 4(b)(3) must refer to a benefits program as an integral administrative unit. If an employer, using a single administrative unit, provides disability benefits as part of a larger welfare scheme, comprising, for example, health insurance as well as disability benefits, then that scheme as a whole constitutes the employer's "plan." Because such a plan provides types of benefits that the states cannot permissibly require under § 514(a), the plan could not be said to be maintained "solely" to comply with state disability insurance laws. On the other hand, if an employer's disability program constitutes a separate unit, concerned predominantly with disability benefits and organized so that it is substantially independent of other benefits programs, then that program itself constitutes a "plan." Such a plan is potentially subject to state regulation under a law like the DBL.

■ Most disability programs that constitute separate "plan[s]" will have been adopted "solely" to comply with state disability insurance laws applicable to the employer. The airlines' argument that the employer's intentions are dispositive in determining this issue proves too much. Any employer, even the small intrastate employer at whom the airlines contend § 4(b)(3) was aimed, could credibly claim that it had adopted a disability plan in order to attract and keep good employees, smooth labor re-

lations, and the like. Congress did not intend § 4(b)(3) to empower employers to evade state regulation by engaging in a swearing contest concerning their motives. Structural considerations, not subjective intentions, must govern the analysis under § 4(b)(3). Thus, if an employer maintains a separate disability plan that generally meets the requirements of applicable state disability insurance laws, the court should find that the plan was adopted "solely" to comply with those laws, unless compelling circumstances, not applicable to employers generally, dictate otherwise. *See Standard Oil Co. v. Agsalud*, 442 F.Supp. 695, 704 (N.D.Cal.1977), *aff'd*, 633 F.2d 760 (9th Cir. 1980).

Turning to the case before us, we note that the airlines' amended complaint did not clearly describe their benefits plans. It stated in general terms that "[p]laintiffs maintain various employee benefit plans, including sickness and accident disability plans, sick leave plans, and medical benefit plans," and that these plans "are funded and administered in several different ways." It is possible that some or all of the plaintiffs maintain disability benefits programs that are "plan[s]" maintained "solely" to comply with state law under the analysis presented above. Such plans would be exempt from regulation under ERISA and would be subject to the DBL in its entirety, including its provisions governing minimum pregnancy benefits. Such plaintiffs would not be entitled to relief against the Board. Other plaintiffs, however, may maintain more complex benefits systems that do not employ a separate "plan" for disability. The DBL is preempted in its entirety with respect to such plaintiffs, and is wholly unenforceable against them.[29] Each plaintiff must have an opportunity to show the nature of its disability program under the analysis set forth above.

## CONCLUSION

Insofar as the judgment of the district court enjoined enforcement of the HRL, we

---

**29.** Nothing in our decision today forbids the states to require employers to administer disability benefits through a separate "plan" as described herein.

reverse. Insofar as the judgment dismissed plaintiffs' claims that ERISA preempts the DBL, we vacate and remand for further proceedings. No costs.