**640 BROADWAY RENAISSANCE COMPANY, Plaintiff,**

v.

**Mario CUOMO, as Governor of The State of New York, et al., Defendant.**

No. 88 Civ. 6288 (KC).

United States District Court, S.D. New York.

July 2, 1990.

As Corrected July 12, 1990.

Fischbein Badillo, New York City by Kenneth G. Schwartz, Deborah J. Locitzer and David M. Slater, for plaintiff.

Peter L. Zimroth, Corp. Counsel, New York City by Gabriel Taussig, Albert Fred-

ericks, and Catherine B. McAlevey, for City defendants.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City by Dennis J. Saffran, for defendant Governor.

## OPINION AND ORDER *

CONBOY, District Judge:

### BACKGROUND

This case concerns "640 Broadway" a loft building located in an area of Manhattan north of Houston Street known as NOHO. Plaintiff, the owner of the building, has brought this action pursuant to 42 U.S.C. § 1983 to challenge the constitutionality of Article 7–C of the New York State Multiple Dwelling Law, commonly known as the "Loft Law," N.Y. Multiple Dwelling Law §§ 280–87 (McKinney Supp.1989), on various grounds.

The Honorable John Walker, formerly a judge of this Court and now a member of the United States Court of Appeals for this Circuit and to whom this case was previously assigned, wrote a comprehensive opinion dismissing the pendent state law claims against the twenty-three individually named tenant defendants. *640 Broadway Renaissance Co. v. Cuomo*, 714 F.Supp. 686 (S.D.N.Y.1989). The factual background of the litigation was fully set forth in that opinion and, thus, we will not repeat the facts here, save for those necessary to add context. The remaining defendants are the governmental defendants: the Governor of the State of New York, the former Mayor of the City of New York, and the members of the New York City Loft Board, an entity established by the contested legislation charged with the duty of enforcing the law and overseeing the conversion of certain lofts from commercial to residential use. We will refer to the Mayor and the Loft Board defendants collectively as the "City defendants."

In June 1982, in response to the illegal conversion of many New York City loft buildings from commercial to residential uses, the New York State Legislature en-

acted the Loft Law. As stated in section 280 of Article 7–C, the legislative findings section, the Law's purpose is to preserve residential housing and to effectuate legalization of loft units which had been previously converted from commercial to residential use without compliance with the New York City building codes and zoning resolutions. The Loft Law requires owners to bring affected buildings into compliance with previously-ignored building codes, with much of the costs being passed on to the tenants in the form of temporary rent adjustments. An owner who might suffer unjustifiable hardship because of legalization costs was given an opportunity to gain an exemption from the Loft Law by filing a hardship application with the New York City Loft Board within nine months of passage of the Law.

By order dated April 28, 1988, the Loft Board determined that 640 Broadway was an "interim multiple dwelling" as described in section 281 of Article 7–C, and therefore, subject to the provisions of Article 7–C. Once a building is determined to be an "interim multiple dwelling", the owner is required to effect the legal conversion of the property by performing certain acts within the timetable set down by the law.

Plaintiff complains that the law has "numerous confiscatory effects" and thus that the law is constitutionally infirm. Specifically, in Counts 1 through 9 of the complaint the plaintiff alleges the following constitutional violations: (1) that the Loft Law, in conjunction with other related state and city laws effects a taking of private property for public use without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution [Counts 1, 2, 4 and 5]; (2) and that in violation of the Fourteenth Amendment, the Loft Law deprives the plaintiff of liberty and property without due process of law, and denies the plaintiff the equal protection of the law [Counts 6, 7 and 8]; and (3) that in violation of Article I, Section 10 of the United States Constitution, the Loft Law causes a substantial impairment of the obligation of contracts

---

* This is a corrected version of the Court's Opinion and Order dated July 2, 1990.

[Count 3] and (4) that the Law constitutes an unlawful Bill of Attainder [Count 9]. The complaint seeks declaratory, injunctive and monetary relief from the defendants for these constitutional violations.

Plaintiff now moves for summary judgment on each of these constitutional claims. The City defendants have cross moved for summary judgment on essentially two grounds: (1) that because the United States Supreme Court rejected nearly all of the plaintiff's claims in a different case, the claims must be dismissed; and (2) that if the Court were not to dismiss the claims, it must find that Article 7–C is constitutionally valid as it represents a reasonable exercise of the state's legislative authority.

In addition, Governor Cuomo has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure to dismiss on two grounds.[1] First, he contends that he is not a proper defendant in the action. Second, he joins in the City defendants' contention that the complaint fails to state a cause of action against the constitutionality of the challenged state statute. We note that the second branch of the Governor's motion is analyzed in more explicit, and exquisite, detail than the corresponding section of the City's motion. The Governor argues that we need not, and indeed, must not independently decide the constitutionality of the law "in view of the binding precedential effect" of *Spring Realty Co. v. New York City Loft Board,* 127 Misc.2d 1090, 487 N.Y.S.2d 973 (Sup.Ct. N.Y.Co.1985), *aff'd,* 117 A.D.2d 1029, 498 N.Y.S.2d 241 (1st Dep't 1986), *aff'd as modified on other grounds,* 69 N.Y.2d 657, 511 N.Y.S.2d 830, 503 N.E.2d 1367 (1986), *appeal dismissed for want of a substantial federal question,* 482 U.S. 911, 107 S.Ct. 3179, 96 L.Ed.2d 668 (1987), and "the need to discourage repetitive litigation commenced in violation of the principle of stare decisis."

Governor Cuomo's Memorandum of Law in Support of His Cross Motion For Judgment on the Pleadings ("Governor's Main Mem.") at 30 n. 10. With respect to those claims not raised in *Spring Realty,* the Governor claims they are meritless as a matter of law and that therefore, they must be dismissed. We agree with the second branch of the Governor's motion for the reasons elaborated upon below.[2]

## ANALYSIS

Although the constitutionality of the Loft Law was previously upheld in *Spring Realty,* plaintiff's initial 68–page memorandum of law nonetheless relegates this case to a single footnote. Plaintiff's Memorandum of Law in Support of its motion for Summary Judgment ("Pltf. Main Mem.") at 21 n. 6. In this footnote, plaintiff conclusorily claims that *Spring Realty* "present[s] [no] barrier to this action. The constitutional challenges to the Loft Law both facially and as applied to this plaintiff are substantially different than those raised in *Spring Realty." Id.*

The defendants assert that we, as a federal court, are bound by the Supreme Court's dismissal of the *Spring Realty* appeal "for want of a substantial federal question." They further state that a comparison of the arguments presented to the United States Supreme Court in *Spring Realty* with those made by plaintiff here reveals that they are for the most part precisely the same, and indeed are often phrased in nearly identical language. As to those claims that were not decided in *Spring Realty,* the bill of attainder and the "vested property right" claims, defendants contend that they are meritless, even bordering on frivolous.

■■■ Defendants are correct regarding the precedential effect of a Supreme Court

1. Because plaintiff, the City defendants, and indeed, the Governor, have presented material outside the pleadings, and because we have not excluded such material for the reasons elaborated upon at pages 1028–29 below we will treat the Governor's motion as one for summary judgment. To do so would not be prejudicial to any party as all have had the opportunity to address such material and present other materials.

2. In light of our disposition of the matter, we do not reach the question of whether the Governor is a proper defendant in the action. Nor do we address the merits of the claims as the City defendants have in the second branch of their motion.

dismissal for want of a substantial federal question. In the seminal case of *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the plaintiffs therein challenged the constitutionality of California's obscenity statute, and a three-judge federal district court held the statute to be unconstitutional. Several weeks later, in *Miller v. California*, 418 U.S. 915, 94 S.Ct. 3206, 41 L.Ed.2d 1158 (1974) (*Miller II,*) the Supreme Court dismissed "for want of a substantial federal question" the appeal from a California state court decision sustaining the constitutionality of the same statute. The *Hicks* defendants thereupon moved for reconsideration in the district court. The district court denied this motion, holding that it was not bound by the Supreme Court's dismissal of the *Miller II* appeal, and reaffirming its previous ruling that the statute was unconstitutional.

The Supreme Court chastised the district court for this holding:

[T]he District Court was in error in holding that it could disregard the decision in *Miller II*. That case was an appeal from a decision by a state court upholding a state statute against federal constitutional attack. A federal constitutional issue was properly presented, it was within our appellate jurisdiction under 28 U.S.C. § 1257(2), and we had no discretion to refuse adjudication of the case on its merits as would have been true had the case been brought here under our certiorari jurisdiction. We are not obligated to grant the case plenary consideration, and we did not; but we were required to deal with its merits. We did so by concluding that the appeal should be dismissed because the constitutional challenge to the California statute was not a substantial one. The three-judge court was not free to disregard this pronouncement....

---

**3.** Effective September 25, 1988, 28 U.S.C. § 1257 was amended, *inter alia,* such that there is no longer an appeal as of right where the constitutionality of a state statute is drawn in question as there was at the time of *Spring Realty*. Accordingly, all such cases may now be reviewed by the Supreme Court by writ of certiorari only, with a denial thereof, as in all denials of certiorari, having no precedential force. 28 U.S.C.A. § 1257, D. Siegel, *Commentary on 1988 Revision*

"[V]otes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits of a case..," [citations omitted]. The District Court should have followed the Second Circuit's advice, first, in *Port Authority Bondholders Protective Committee v. Port of New York Authority*, 387 F.2d 259, 263 n. 3 ([2d Cir.] 1967), that "unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise"; and, later, in *Doe v. Hodgson*, 478 F.2d 537, 539 [2d Cir.], *cert. denied*, 414 U.S. 1096, 94 S.Ct. 732, 38 L.Ed.2d 555 (1973), that the lower courts are bound by summary decisions by this Court " 'until such time as the Court informs [them] that [they] are not.' "

422 U.S. at 343–45, 95 S.Ct. at 2288–90. . Thus, while it is true that a summary affirmance or a summary dismissal for want of a substantial federal question is not of the same influence and impact as a signed opinion, *Edelman v. Jordan*, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974), such summary decisions are nevertheless decisions approving the merits. *Hicks, supra*, 422 U.S. at 344, 95 S.Ct. at 2289. *Spring Realty*, like *Miller II*, was an appeal from a state court decision upholding a state statute against federal constitutional attack, and was thus within the Supreme Court's obligatory appellate jurisdiction under 28 U.S.C. § 1257(2).[3] *See Spring Realty Co. v. New York City Loft Board*, Jurisdictional Statement (U.S.Sup.Ct. Mar. 12, 1989) (attached as Appendix to the Governor's Main Mem.) at 2.[4] The Court's summary dismissal of

---

at 42–43 (Supp.1990). Contrary to plaintiffs assertion, there is nothing to indicate that *Hicks* and its progeny are not still good law with respect to summary dismissals of appeals brought as of right prior to the amendment of section 1257.

**4.** We will cite to the *Spring Realty* jurisdictional statement as "Jur. St."

the appeal in *Spring Realty* is therefore as binding upon this court in the present case as its summary dismissal of the *Miller II* appeal should have been upon the district court in *Hicks*.

■ The next question we must examine is just what binding effect *Spring Realty* is entitled to. Although the *Hicks* court relegated discussion of the exact scope of the summary dismissal's effect on a subsequent case to a footnote, 422 U.S. at 345 n. 14, 95 S.Ct. at 2290 n. 14, the Court, a few years later, focused on the parameters of such dispositions as set out in footnote fourteen of *Hicks, see Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), (per curiam), and, in doing so, gave the lower federal courts instruction on how to "[a]scertain the reach and content of summary actions." *Hicks,* 422 U.S. at 345 n. 14, 95 S.Ct. at 2290 n. 14.

The Court stated that:

[b]ecause a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below.... Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.

*Mandel,* 432 U.S. at 176, 97 S.Ct. at 2240. *Accord Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 182, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979) (summary affirmance has no precedential effect with respect to issue not presented in appellant's jurisdictional statement). Thus, the precedential effect of a summary affirmance extends only to the issues presented to the Court and actually and necessarily decided by the lower courts. *Mandel, supra.* The Supreme Court has cautioned, however that "questions which 'merely lurk in the record' are not resolved, and no resolution of them may be in-

ferred." *Socialist Workers, supra,* 440 U.S. at 183, 99 S.Ct. at 989.

■ It is, therefore, clear that we must, at the very least, carefully examine the appellant's jurisdictional statement in order to ascertain which specific challenges were presented to and, thus, decided by the Supreme Court. *See League of Women Voters v. Nassau County Board of Supervisors,* 737 F.2d 155 (2d Cir.1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985); *Delta Air Lines, Inc. v. Kramarsky,* 650 F.2d 1287, 1295 (2d Cir.1981), *aff'd in part and vacated in part,* 666 F.2d 21 (2d Cir.1981), *aff'd in part, vacated in part and remanded sub nom., Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The Governor contends that we may look only to the jurisdictional statement. Plaintiff asserts that, in addition to examining the jurisdictional statement, we must also look at the opinions and at the actual documents which form the litigation record to determine whether the precise issues as stated in the jurisdictional statement "were necessarily decided in the prior court opinions." Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and In Opposition to Defendant's Cross Motions ("Pltf. Reply Mem.") at 16. In other words, plaintiff claims that we are to ascertain whether "the facts of the case plainly reveal a basis for the lower court's decision more narrow than the issues listed in the jurisdictional statement" *see Hardwick v. Bowers,* 760 F.2d 1202, 1203 (11th Cir. 1985), *rev'd on other grounds,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and, if so, we should assume that the "Supreme Court decided the issue on that narrow ground." *Id.* The rationale underlying this conclusion in *Hardwick* was that "if the jurisdictional statement could expand a summary affirmance beyond the scope of issues necessarily decided, it would give the litigants considerable control over the scope of summary dispositions." *Id.* at 1208.

As counsel for the Governor has suggested, this rationale, although superficially appealing, is analytically flawed, as it

implies that looking to the jurisdictional statement allows *both* litigants, including the appellee, whose interest is to expand the scope of the decision, the opportunity to influence this scope. In fact, as the Governor points out, "use of the jurisdictional statement places such 'control' only in the hands of the appellant, whose interest is of course to keep the scope of the decision as narrow as possible should its appeal be rejected, and the appellant exercises this 'control' not by fiat but by placing issues before the Supreme Court for review." Governor's Reply Memorandum of Law in Support of His Cross–Motion for Judgment on the Pleadings ("Governor's Reply Mem.") at 9 n. 4. Nonetheless, we believe that the conclusion, that we should look to the underlying opinion and record in addition to the jurisdictional statement, is sound.

Although the two cases on this issue in our circuit have looked to the jurisdictional statement to "ascertain the reach and content of the summary action." one of them, *League of Women Voters, supra,* 737 F.2d at 168–69, did suggest that in order to determine the issues "fairly comprised" within the jurisdictional statement, in accordance with Supreme Court Rule 15.1(a), a court might look at the other documents in the record of the earlier litigation. Indeed, in that case, the Second Circuit used the underlying documents in the record to determine that a particular issue was "fairly comprised" within the jurisdictional statement such that the summary adjudication was controlling on that issue. *League of Women Voters,* 737 F.2d at 168–172. In so doing, the court adopted the reasoning of another court that " '[a] summary disposition has precedential value in cases virtually indistinguishable from the case summarily disposed of ... and in cases involving ... slightly different facts and issues....' " *Id.,* 737 F.2d at 170 (quoting *Bangor Baptist Church v. Maine,* 549 F.Supp. 1208, 1219 (D. Maine 1982); *see also Delta Air Lines, supra,* 650 F.2d at 1295 (issue precluded if "substantially similar" to the issue in the jurisdictional statement).

Thus, it can be said that the court in *League,* in utilizing the underlying documents to help determine the "reach and content" of the summary adjudication, relied on such documents to give a more comprehensive reach to the summary disposition than that evident from the fact of the jurisdictional statement. We do not see why, contrary to the assertion of the Governor, such documents cannot be used to demonstrate that an issue is not fairly comprised within the jurisdictional statement, that is, to show that the jurisdictional statement overstates the issues that were actually presented to and decided by the lower court. *See Socialist Workers, supra,* 440 U.S. at 183, 99 S.Ct. at 989 (no precedential effect of issues merely lurking in the record). We also see no reason why we should not look at the lower court opinions, although the Governor asserts that we should not, stating that the Supreme Court in *Mandel* took "great pains to dissociate" the jurisdictional statement from the opinion. Governor's Reply Mem. at 7. While the Supreme Court in *Mandel* did say that the rationale of a summary affirmance may not be gleaned solely from the opinion below, it did not say that the jurisdictional statement is to be looked at exclusively or that we may not look to the opinions at all.

Despite the fact that it was plaintiff who argued that we must look to the underlying record in addition to the jurisdictional statement, our decision to do so does not really aid the plaintiff here, as it has failed to provide the careful analysis of the documents necessary to show that the issues as set out in the jurisdictional statement are broader than what was actually presented to and decided by the New York Courts. Indeed, save for one issue addressed in its sur-reply memorandum, the so-called *"per se* taking" argument, plaintiff makes little use of the documents. We will approach the issues raised in plaintiff's complaint and moving memorandum which are potentially precluded by *Spring Realty* in the following order: the due process arguments, the equal protection contentions, the Contract Clause arguments and finally the "takings" claims. We will then discuss the other two issues which the de-

fendants concede were not raised in *Spring Realty:* the contention that plaintiff had a "vested right" in the City's pre-Loft Law zoning regulation and the bill of attainder claim.

### A. Claims Potentially Precluded By Spring Realty

#### 1. *Due Process Claims*

■ In Point III(A) of its memorandum, plaintiff claims that the Loft Law exceeds the reach of the State's police power to regulate the use of private property, and thus violates the Due Process Clause. A similar due process claim was advanced in *Spring Realty, see* Question Presented 2, Jur.St. at ii; Jur.St. at 11–17; *see especially id.* at 17 ("present action offers this Court the opportunity to announce criteria" governing reach of "police power"), and squarely decided by both the Supreme Court and the New York courts.

Crucial to the present plaintiff's due process argument is the claim that loft owners had a reliance interest in the unregulated commercial development of their property. Pltf. Main Mem. at 52. Precisely the same "expectation interest" argument was made by the *Spring Realty* appellants:

[A] huge economic value has been taken from the owners, constituting an interference with their economic expectations that upon expiration of all leases, they would have vacant buildings which could be remodeled, demolished, sold or otherwise disposed of as the owners might desire.

It has become impossible for owners to reap commercial returns ... or sell the buildings for commercial development. Under the guise of an exercise of the police power, the statute forces the owner to assume the cost of providing a benefit to the "public" without recoupment.

Jur.St. at 18.

Plaintiff here also argues that the Loft Law violates due process because of the expiration of the hardship exemption of

Multiple Dwelling Law § 285(2). Pltf. Main Mem. at 52–53. Incredibly, plaintiff argues that this argument was not made to the Supreme Court, *see* Pltf. Reply Mem. at 30–33, and that, in any event, the facts are different here because the hardship provision had not expired when the *Spring Realty* case was commenced but it had when this case was commenced. In fact, the hardship exemption had expired prior to the commencement of *Spring Realty, see* Jur.St. at 3. Moreover, the *Spring Realty* appellants specifically called the Supreme Court's attention to the expiration of this provision, arguing that, as a result, "it is impossible for a new or a late registrant or an owner undergoing changed circumstances to file for a hardship." Jur.St. at 14. Nonetheless, the Court rejected their due process claim, and, accordingly, the claim must be rejected again here.[5]

#### 2. *Equal Protection Claim*

■ In Counts 6, 7 and 8 of the complaint, the plaintiff contends that the Loft Law violates the equal protection clause of the Fourteenth Amendment which provides that no state shall "deprive any person ... the equal protection of the laws." We note preliminarily that "Question Presented No. 3" in the jurisdictional statement broadly requests that the Court decide whether the Loft Law "constitutes a denial of equal protection of the laws." In its moving brief, plaintiff here likewise broadly states for its Point IV that the "Loft Law deprives [it] of equal protection of the law." Pltf. Main Mem. at ii. The facial similarity of the point headings is not all though; the specific substantive arguments made in the plaintiffs' memorandum and in the body of the *Spring Realty* appellants' jurisdictional statement are also strikingly similar.

For example, the essence of plaintiff's equal protection claim is that:

There was simply no rational basis ... for treating the owners of commercial loft buildings located in certain zoning districts which contained three or more

---

5. Under a due process rubric, plaintiff also presented its novel argument that it had acquired a vested right in the City's pre-Loft Law zoning regulations so as to preclude a change in

the law. This argument will be addressed in a later section of this opinion. See below at 1036–38.

residential tenants during the retroactive and arbitrarily selected sixteen month period from April 1, 1980 through December 1, 1981, differently from the owners of other commercial loft buildings.

Pltf. Main Mem. at 57–58. In almost identical language, the equal protection section of the *Spring Realty* jurisdictional statement begins:

There is no rational basis for treating owners of buildings containing three or more residential units during the "window" period from 1980 to 1981 differently from other owners of property in the City of New York, whether commercial or residential.

Jur.St. at 20.

The present plaintiff's memorandum elaborates upon this argument as follows:

[T]he statute requires the owners of the targeted loft buildings to assume the economic burden of housing and subsidizing artists, a burden that should be, if at all, borne by the public at large. Additionally, the statute creates a special class of loft building owners, and imposes staggering economic and legal obligations on them that are not imposed on other commercial property owners.

Pltf. Main Mem. at 58. The *Spring Realty* jurisdictional statement elaborated as follows:

Article 7–C has as its real purpose the protection of a particular class and not the general public. Thus, the statute in effect protects one class of citizens against another, at the expense of that other class. Although appellants are not substantially different from other owners of commercial buildings in the City of New York, Article 7–C singles them out for treatment in an arbitrary manner.

Jur.St. at 20.

The plaintiff herein, observing that only loft buildings covered by the Loft Law are subject to rent control, while other loft buildings are not, argues that surely this classification is irrational. Pltf. Main Mem. at 58–59. The *Spring Realty* appellants made the same argument:

[O]wners affected by Article 7–C are discriminated against because, unlike other commercial property owners similarly situated, they are forced to subsidize the rentals of their tenants; the Article impermissibly introduces a form of commercial rent control.

... No other class of private real property owners within the state is forced to subsidize commercial tenants nor to accept commercial rentals at reduced, regulated rates pursuant to a rent regulation scheme.

Jur.St. at 20.

We have carefully examined the opinions in *Spring Realty* and the underlying record as submitted to us, and conclude that the jurisdictional statement does not overstate what was presented to and necessarily decided by the New York courts. Accordingly, we are left with the inescapable conclusion that all of plaintiff's equal protection arguments were disposed of by the Supreme Court's summary dismissal in *Spring Realty*, and thus cannot be reargued here.

### 3. *Contract Clause Claim*

In Point V of its memorandum, plaintiff claims that the Loft Law unconstitutionally impairs the obligation of private contracts by superceding the provisions of the Loft Leases in violation of Article I, Section 10 of the United States Constitution. Plaintiff unsuccessfully argues that *Spring Realty* has no precedential effect here as "the factual setting and the terms, contents and conditions of the plaintiff's leases are totally different than the *Spring Realty* Leases." Pltf. Reply Mem. at 39. To support this claim, plaintiff has submitted a copy of the commercial Loft Lease used for the 640 Broadway tenants. This lease is a standard form lease with several riders.

It is quite clear that the New York Courts considered and adjudicated the claim that the Loft Law impaired the obligation of private contracts by overriding the fundamental terms of the Loft owners' commercial leases—specifically including those terms relating to residential use, term of occupancy, eviction, rent, heat and

other services, and subletting and assignment. Contrary to the plaintiff's assertion, every single provision of the lease need not have been itemized for the state courts; it is beyond question that the courts were considering the effect on the leases as a whole. It is also clear that these same arguments were presented to the Supreme Court in the jurisdictional statement. Jur.St. at 21–22. Indeed, plaintiff's memorandum of law with respect to these claims resembles in large part the jurisdictional statement. *Compare* Pltf. Main Mem. at 63–64 *with* Jur.St. at 20–21. For example, plaintiff concludes that the Loft Law "grants the equivalent of life-estates to the occupants" "by transforming a short-term commercial lease into a perpetual residential tenancy." Pltf. Main Mem. at 64. The phrase used in the *Spring Realty* jurisdictional statement was that the Law "gives tenants a virtually unlimited term of occupancy for any residential and/or commercial purpose." Jur.St. at 21.

Accordingly, the Supreme Court having rejected the Contract Clause claim made by the *Spring Realty* appellants and the plaintiff's claim being virtually identical thereto, we are obliged not to readjudicate the merits of the issue.

### 4. *The Takings Clause Claims*

■ Plaintiff argues that the Loft Law imposes unreasonably burdensome obligations and deprives it of certain fundamental property rights, thereby effecting a taking of the building without just compensation in violation of the Fifth and Fourteen Amendments. Plaintiff posits the alleged violations in three ways: that the Loft Law effects (1) a *per se* taking of the building itself; (2) a *per se* taking of the plaintiff's interest in the fixtures and improvements added by the tenants to the lofts; and (3) a regulatory, or *de facto*, taking of the building.

In its reply memorandum, plaintiff apparently concedes that the regulatory taking argument was presented to and adjudicated by both the New York courts and the Supreme Court. *See* Pltf. Reply Mem. at 21–24. Accordingly, we are bound by the

precedential effect of the Supreme Court's summary dismissal in *Spring Realty* and will not consider anew the argument of a regulatory taking.

The Governor argues that plaintiff's *per se* takings claims were also previously adjudicated, a contention that plaintiff hotly disputes. It is clear, however, that the *per se* taking argument was unambiguously made by the *Spring Realty* appellants in their jurisdictional statement. *See* Jur.St. at 18–19. Citing *Hall v. City of Santa Barbara,* 797 F.2d 1493 (9th Cir.1986) [*amended,* 833 F.2d 1270 (9th Cir.1987)], *cert. denied,* 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988), the *Spring Realty* appellants declared that the Supreme Court was "presented with the opportunity to decide the issue of whether Article 7–C presents a ... taking case ... involving the physical occupation of property", and argued that the Loft Law, like the ordinance at issue in *Hall,* effects a *per se* taking by "transfer[ring] a possessory interest in the buildings to the tenants." Jr.St. at 18, 19. Plaintiff here makes exactly the same argument in Point I(B) of its moving memorandum. In its reply and sur-reply memoranda, plaintiff acknowledges that the *Spring Realty* appellants included this argument in the jurisdictional statement, but charges that it was made in an "attempt to enlarge the scope of their 'taking' claim." *See* Plaintiff's Supplemental Memorandum of Law in Support of its Motion for Summary Judgment and in Opposition to the Defendants Cross–Motions ("Pltf.Supp.Mem.") at 8. Plaintiff contends that the *per se* taking argument was never raised in any of the state courts, and therefore, that the issue could not properly be decided on an appeal to the United States Supreme Court. Thus, to the plaintiff, the jurisdictional statement exaggerates the issues actually decided by the state courts.

To support this argument, plaintiff points to certain pages of the *Spring Realty* appellants' brief to the New York Court of Appeals, which plaintiff admits contain a "completely garbled" takings analysis, *see* Pltf.Supp.Mem. at 8, but which, plaintiff nonetheless argues, present only a regula-

tory taking argument. We agree that the argument in the brief appears to focus primarily on a regulatory taking. We observe, however, that the plaintiff did not submit for our review any of the *Spring Realty* appellants' other briefs to the lower courts or the responses thereto by the governmental defendants. Thus, we are unable to ascertain from the plaintiff's submissions to us whether the *per se* taking argument was made earlier in the litigation and essentially dropped on appeal because those appellants felt it was less weighty than their other arguments, or whether it was never made at all.

Our examination, however, of the trial court's opinion and the cases cited therein persuades us that the *per se* taking argument was, in fact, made in and rejected by the lower court. *Spring Realty Co. v. New York City Loft Board*, 127 Misc.2d 1090, 1093–94, 487 N.Y.S.2d 973, 976 (Sup. Ct.N.Y.Co.1985). Indeed, the first factor of the analysis for a regulatory taking is the same as the entire analysis employed to determine whether a *per se* taking has occurred: the court must look at the "character of the government action." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *accord Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868 (1982). Where regulatory takings are alleged, the court must also look at whether the state seeks to further legitimate interests by the enactment of the law and whether the "mere enactment" of the law has deprived the claimant of all beneficial, economically viable use of its property. *Keystone Bituminous Coal Ass'n v. De Benedictis*, 480 U.S. 470, 485, 493, 107 S.Ct. 1232, 1242, 1246, 94 L.Ed.2d 472 (1987); *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). Because the trial court went on to consider the other two factors of the takings analysis, it is plain that it did not consider the character of the government action to constitute a physical invasion by the government, but rather that it found that the law could only be construed as a restriction on the use of the property. Ac-

cordingly, we conclude that the issue of whether there was a physical invasion of the property was actually and necessarily decided by the lower court. We thus reject the plaintiff's contention that the jurisdictional statement is overstated, and we find that the issue of *per se* taking was properly presented to and directly rejected by the Supreme Court.

We now reach plaintiff's last argument as to why we should decide the merits of the takings issue: that "doctrinal developments" since the Supreme Court's summary dismissal of the *Spring Realty* appeal have undermined its precedential value. *See Hicks, supra*, 422 U.S. at 344, 95 S.Ct. at 2289. The cases cited by the plaintiff for this proposition, *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) and *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), were decided, respectively, just one day and just three weeks after the Supreme Court's dismissal of the *Spring Realty* appeal. Thus, one could hardly call these "developments." The third case cited for this proposition, *FCC v. Florida Power Corp.*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987) was decided four months prior to *Spring Realty*, and, therefore, certainly can not be labelled a "development." In its reply brief, but not in the doctrinal developments section thereof, plaintiff also discusses a recent New York Court of Appeals case, *Seawall Associates v. City of New York*, 74 N.Y.2d 92, 544 N.Y.S.2d 542, 542 N.E.2d 1059, *cert. denied*, —— U.S. ——, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989). In that case, the court declared unconstitutionally invalid the New York City Single Room Occupancy Law. The Supreme Court denied the City's petition for a writ of certiorari. *Seawall* does not constitute a "doctrinal development" for two reasons: because denials of certiorari have no precedential force, *see supra* at 1027 and footnote 3; and because the decision of the New York Court of Appeals, or of any other court other than the United States Supreme Court is not a "doctrinal

development" within the meaning of *Hicks v. Miranda. Hicks, supra,* 422 U.S. at 344, 95 S.Ct. 2289; *see Soto–Lopez v. New York City Civil Service Commission,* 755 F.2d 266, 272 (2d Cir.1985) (the summary affirmance "constitutes binding precedent for the present case unless ... overruled, explicitly or implicitly, by a subsequent Supreme Court decision"); *League of Women Voters v. Nassau County Board of Supervisors,* 737 F.2d 155, 172 (2d Cir.1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985) ("The Supreme Court has not informed us otherwise—either indirectly or by doctrinal development.").

There being no doctrinal developments of which we are aware, and having concluded that the *per se* taking issue was presented not only to the Supreme Court but also to the New York courts, we are bound by the Supreme Court's rejection of the *Spring Realty* appeal and we therefore must decline the plaintiff's invitation to decide the issue of a *per se* taking anew.[6]

## B. Other Claims

### 1. *Bill of Attainder Claim*

In Count 9 of its complaint, plaintiff alleges that the Loft Law constitutes an unlawful bill of attainder within the meaning of Article I, section 10 of the United States Constitution. Specifically plaintiff claims that the New York State Legislature has retroactively singled out a small group of property owners who operated commercial loft buildings in certain zoning districts in New York City, which lacked a residential certificate of occupancy on June 21, 1982, and which had been residentially occupied by three or more families during the statutory window period of April 1, 1980 to December 1, 1981.

Plaintiff contends that this is a narrowly defined and retroactively selected group of individuals within the meaning of the bill of attainder clause. Plaintiff further maintains that the legislature determined that this "easily ascertainable group was

'guilty' of unspecified crimes, and then inflicted punishment upon them" via the Loft Law without a judicial trial. Pltf. Main Mem. at 67. The so-called "punishment" inflicted by law is alleged to be the devastating economic hardship that will befall the plaintiff if it is forced to undertake conversion renovations. *Id.*

The plaintiff also asserts that "because the building is now subjected to the strictest rent control, its value is drastically diminished, and the plaintiff is forever stripped of his property rights in the fixtures and numerous other property rights." *Id.* The plaintiff states that these "economic burdens are further compounded by the confiscation of its property rights to decide the lawful use to which the building will be put; to choose its tenants, and to negotiate the terms of its leases, and to be subject to mandated capital expenditures at the whim of the City, State and the Loft Board." *Id.* Finally, plaintiff contends that because the hardship exemption has expired, it has no statutory basis for avoiding compliance with the law, and therefore its "punishment" is "inescapable." *Id.* at 68.

The Supreme Court has described "the key features of a bill of attainder" as: "[a] a law that legislatively determines guilt and inflicts punishment [b] upon an identifiable individual [c] without provision of the protections of a judicial trial." *Nixon v. Administrator of General Services,* 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977), *quoted in Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 846–47, 104 S.Ct. 3348, 3351–52, 82 L.Ed.2d 632 (1984). Whether the statute "inflicts punishment" within the meaning of the first factor entails a further three-part analysis:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative

---

**6.** We observe that even if we were to decide the issue, the City Defendants' Memorandum in Support of its Cross–Motion for Summary Judgment at pages 34 through 45 provides an excellent analysis of why the Law is valid.

purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'

*Id.* at 852, 104 S.Ct. at 3355 (quoting *Nixon, supra,* 433 U.S. at 473, 475–76, 478, 97 S.Ct. at 2805, 2806–07, 2808).

In applying this test, the courts have been exceptionally mindful of the dangers of an expansive reading of the Bill of Attainder Clause and have been extremely loathe to find a challenged statute constitutes a bill of attainder. As stated recently by Chief Judge Munson of the Northern District of New York:

Of course, all modern legislation regulating the economic activities of specific groups might be considered 'punishments,' and the bill of attainder clause, if read too broadly, could be used to cripple the ability of legislatures to respond to some perceived social or economic problem by imposing restrictions or limitations on individuals, corporations, or industries which are deemed responsible for the problem. Consequently, the bill of attainder clause has been used sparingly in invalidating legislation. It has been applied only to legislation closely paralleling the historical characteristics of common law bills of attainder and bills of pains and penalties, the most important of which is a design to '[inflict][ ] its deprivation upon the members of a political group thought to present a threat to national security.' *United States v. Brown,* 381 U.S. 437, 453 [85 S.Ct. 1707, 1717, 14 L.Ed.2d 484] (1965).... *The court is aware of only four cases decided by the Supreme Court since the Civil War in which a statute was invalidated under the bill of attainder clause, and all four involved legislative sanctions against perceived 'traitors' or 'subversives'.*

*Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370, 403 (N.D.N.Y.1987) (emphasis added) (citations omitted).

Leaving aside for a moment the specificity element (factor [b]), it is plain that plaintiff has failed to show that the Loft Law constitutes "punishment" (factor [a]) as the term has been interpreted by the courts. "Punishment" will be found only where the statutory burden is "... so disproportionately severe and so inappropriate to nonpunitive ends ..." that a legislative desire to punish can be discerned. *Nixon, supra,* 433 U.S. at 474, 97 S.Ct. at 2806. Where, on the other hand, the statutory burdens further legitimate, nonpunitive legislative purposes, the Bill of Attainder clause is not implicated. *Selective Service System, supra,* 468 U.S. at 852, 104 S.Ct. at 3355.

For example, in the *Nixon* case, former President Nixon challenged the Presidential Recordings and Materials Preservation Act, Pub.L. 93–526, 88 Stat. 1695 (note following 44 U.S.C. § 2111 [West Supp. 1989]), which applied exclusively to his presidential papers and placed restrictions upon his control of those papers that were not placed upon other former presidents. The Supreme Court held that the Act did not constitute a bill of attainder, as neither the punishment nor the specificity elements were met. In holding that the Act did not "inflict punishment" upon Mr. Nixon, the Court emphasized that "[f]orbidden legislative punishment is not involved merely because the Act imposes burdensome consequences." 433 U.S. at 472, 97 S.Ct. at 2805. Applying the three-part test of punishment noted above, the Court found that "the Act imposes no punishment traditionally judged to be prohibited by the Bill of Attainder Clause", such as death, imprisonment, banishment, "punitive confiscation of property" or exclusion from practicing one's profession, *id.* at 475, 473–74, 97 S.Ct. at 2806, 2805–06; that the Act was reasonably related to the furtherance of non-punitive legislative purposes, *id.* at 475–78, 97 S.Ct. at 2806–08; and that there was no evidence in the legislative record of a Congressional intent to judicially punish Mr. Nixon, *id.* at 478–83, 97 S.Ct. 2808–11.

Plaintiff, of course, has seized on the language "punitive confiscation of property," arguing that the Loft Law constitutes economic confiscation in the nature of punishment. We disagree, concluding that the legislation in issue is an example of economic regulation in today's complex world, and is rationally related to the legitimate and non-punitive legislative goal of provid-

ing safe and habitable housing. We also observe that plaintiff has not offered any evidence from the legislative record or elsewhere to support a claim of legislative intent to punish affected Loft owners.

Regarding the specificity element, the *Nixon* court found "the Act's specificity—the fact that it refers to appellant by name—does not automatically offend the Bill of Attainder Clause", as Mr. Nixon "constituted a legitimate class of one." 433 U.S. at 472–73, 97 S.Ct. at 2805–06. In reaching this conclusion, the Court stressed its unwillingness of use the Bill of Attainder Clause to police the classifications that are inherent to all legislation. The Court stated that:

> [Nixon] argues that ... the Constitution is offended whenever a law imposes undesired consequences on an individual or on a class that is not defined at a proper level of generality. The Act in question therefore is faulted for singling out appellant, as opposed to all other Presidents or members of the Government, for disfavored treatment.

> [Nixon]'s characterization of the meaning of a bill of attainder obviously proves far too much. By arguing that an individual or defined group is attained whenever he or it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment. His view would cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality. Further, every person or group made subject to legislation which he or it finds burdensome may subjectively feel, and can complain, that he or it is being subjected to unwarranted punishment. However expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all

other plausible individuals. In short, while the Bill of Attainder Clause serves as an important 'bulwark against tyranny,' it does not do so by limiting Congress to the choice of legislating for the universe, or legislating only benefits, or not legislating at all.

*Id.* at 469–71, 97 S.Ct. at 2803–05 (citations omitted).

As Justice Frankfurter stated in his concurrence in *United States v. Lovett*, 328 U.S. 303, 324, 66 S.Ct. 1073, 1083, 90 L.Ed. 1252 (1946), which was quoted with approval in *Nixon*, 433 U.S. at 470 n. 32, 97 S.Ct. at 2804 n. 32, and in *Selective Service System*, 468 U.S. at 852 n. 8, 104 S.Ct. at 3355 n. 8, "[t]he fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed."

Accordingly, for all of the above reasons, we find that the Loft Law imposes only the sort of economic burdens that mark all regulatory legislation, that it furthers legitimate public goals which are well within the scope of the State's police power, and that there is no evidence of legislative intent to punish. The plaintiff's Bill of Attainder claim is therefore dismissed.

### 2. Vested Rights Claim

 Plaintiff argues that it had a "vested property right" in the City's pre-Loft Law zoning regulations and the commercial certificate of occupancy issued thereunder, and that the State and the City were therefore prevented from duly amending these regulations in order to allow residential use of plaintiff's building. For this proposition, plaintiff cites a limited New York zoning principle articulated in *LeFrak Forest Hills Corp. v. Galvin*, 40 A.D.2d 211, 338 N.Y.S.2d 932 (2d Dep't 1972), *aff'd mem.* 32 N.Y.2d 796, 345 N.Y.S.2d 547, 298 N.E.2d 685 (1973), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973). In that case, the court held that "[a] vested right to finish a nonconforming building matures when substantial work is performed and obligations are assumed in re-

liance on a permit legally issued" for construction of the building prior to a zoning change making it a nonconforming use. 40 A.D.2d at 218, 338 N.Y.S.2d at 939. This doctrine is wholly inapposite here as it applies to a building undergoing construction at the time of a zoning change, and protects a builder who has performed "substantial work" on the building in reliance on the previous zoning classification. Plaintiff here is not constructing a building, and has proffered no evidence that it performed "substantial work" in reliance upon the pre-Loft Law zoning regulations. Indeed, it is attempting to avoid performance of the work that coverage under the Loft Law would entail. Furthermore, we observe that plaintiff has entirely ignored the Governor's citation to the controlling case authority; plaintiff has not cited the general rule, but only the exception thereto.

The Second Circuit Court of Appeals, applying both Supreme Court and New York law, held that a property owner has no constitutionally protected property interest in an existing zoning classification. *Ellentuck v. Klein*, 570 F.2d 414 (2d Cir.1978). Property interests are

> 'of course . . . not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understanding [sic] that secure benefits and that support claims of entitlement to those benefits.' *Board of Regents v. Roth*, 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] (1972), quoted in *Paul v. Davis*, 424 U.S. 693, 709 [96 S.Ct. 1155, 1164, 47 L.Ed.2d 405] (1976).

Under New York law, the source of plaintiffs' property rights, a landowner has no vested right in the existing classification of his property. *Shepard v. Skaneateles*, 300 N.Y. 115, 89 N.E.2d 619 (1949).

*Ellentuck*, 570 F.2d at 429.

We have no doubt that the Second Circuit correctly applied New York law and that the analysis is dispositive of plaintiff's vested rights claim. Indeed, in the *Shep-*

*ard* case, the New York Court of Appeals found that the rezoning of an owner's property from commercial to residential use did not deprive the owner of any constitutionally protected rights. This holding was more recently reiterated by the New York's highest court in *McGowan v. Cohalan*, 41 N.Y.2d 434, 393 N.Y.S.2d 376, 361 N.E.2d 1025 (1977). There, the court stated:

> [B]oth courts below properly rejected appellant's contention that he possessed a vested right to the continuation of an industrial zoning classification. The simple application of a zoning classification to property does not create a right to forever be similarly so classified. 'Changed or changing conditions call for changed plans, and persons who own property in a particular zone or use district enjoy no eternally vested right to that classification if the public interest demands otherwise.'

*Id.* at 438, 393 N.Y.S.2d at 379, 361 N.E.2d at 1028 (quoting *Rodgers v. Village of Tarrytown*, 302 N.Y. 115, 121, 96 N.E.2d 731, 733 (1951)). *See also Alaimo v. Town of Greece*, 68 A.D.2d 743, 746, 418 N.Y.S.2d 492, 494 (4th Dep't 1979) (no eternally vested right to zoning classification); *Mackay v. Mayhall*, 92 Misc.2d 868, 871–72, 401 N.Y.S.2d 679, 682 (Sup.Ct.Suf.Co.1977) (no vested right to the continuation of a particular provision of the zoning law); *Khare v. Village of Massapequa Park*, 62 Misc.2d 68, 70, 307 N.Y.S.2d 996, 999–1000 (Sup.Ct. Nas.Co.1970) ("it is hornbook law that there is no vested right to the continuation of a particular provision of the zoning law"), *aff'd*, 35 A.D.2d 653, 314 N.Y.S.2d 357 (2d Dep't), *aff'd*, 27 N.Y.2d 991, 318 N.Y.S.2d 746, 267 N.E.2d 481 (1970); *Oriental Boulevard Co. v. Heller*, 58 Misc.2d 920, 928–29, 297 N.Y.S.2d 431, 441 (Sup.Ct. Kings Co.1969) ("an owner of property who has maintained his property in compliance with laws then in existence acquires no vested right or immunity against an exercise of the police power which imposes additional or new requirements with respect to the maintenance or use of such property"), *modified on other grounds and aff'd as modified*, 34 A.D.2d 811, 311 N.Y.S.2d 635 (2d Dep't), *aff'd*, 27 N.Y.2d 212, 316 N.Y.S.2d 226, 265 N.E.2d 72 (1970), *appeal*

*dismissed for want of a substantial federal question*, 401 U.S. 986, 91 S.Ct. 1234, 28 L.Ed.2d 527 (1971).

In view of all of the foregoing well-settled authority, plaintiff's vested rights claim must be dismissed.

### CONCLUSION

Because we are bound by the Supreme Court's summary dismissals, and because we have determined that the plaintiff's due process, equal protection, Contract Clause, and takings claims were previously presented to and adjudicated by both the New York state courts and the United States Supreme Court, and there being no major factual distinctions between the plaintiff herein and the *Spring Realty* appellants nor any doctrinal developments undermining *Spring Realty*, Counts 1 through 8 of the complaint must be dismissed. Although the Bill of Attainder and "vested rights" arguments were not previously presented to the Supreme Court, we conclude that they cannot state a claim as a matter of law, and, therefore, must also be dismissed. Consequently, the entire complaint must be dismissed and the Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.